FILED
United States Court of Appeals
Tenth Circuit

May 24, 2012

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

---

MAINLINE ROCK AND BALLAST,
INC.,

Petitioner,

v.

SECRETARY OF LABOR, MINE
SAFETY AND HEALTH
ADMINISTRATION (MSHA);
FEDERAL MINE SAFETY AND
HEALTH REVIEW COMMISSION,

Respondents.

No. 11-9525
(Petition for Review)

---

**ORDER**

---

Before **KELLY**, **MURPHY**, and **HOLMES**, Circuit Judges.

---

Before the court is the Secretary of Labor's motion to publish our Order

and Judgment in this case, *Mainline Rock & Ballast, Inc. v. Secretary of Labor*,

No. 11-9525, 2012 WL 1111258 (10th Cir. Apr. 4, 2012). Petitioner objects to

the motion. Upon consideration, the court has modified its decision as reflected

in the attached revised decision. With these modifications, the motion to publish

is GRANTED. The Order and Judgment originally filed on April 4, 2012 is

withdrawn, and the clerk is directed to issue the attached opinion as a substitute

for the withdrawn Order and Judgment. The modified opinion does not trigger a new period for filing a petition for rehearing.

Entered for the Court

ELISABETH A. SHUMAKER, Clerk

FILED
United States Court of Appeals
Tenth Circuit

April 4, 2012

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENME CIRCUIT

---

MAINLINE ROCK AND BALLAST,
INC.,

       Petitioner,

v.

SECRETARY OF LABOR, MINE
SAFETY AND HEALTH
ADMINISTRATION (MSHA);
FEDERAL MINE SAFETY AND
HEALTH REVIEW COMMISSION,

       Respondents.

No. 11-9525

---

## ON PETITION FOR REVIEW FROM A DECISION BY THE
## FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION

---

Submitted on the briefs:[*]

Ralph Henry Moore II, Patrick W. Dennison, Jackson Kelly, PLLC, Pittsburgh, Pennsylvania, Christopher Peterson, Jackson Kelly, PLLC, Denver, Colorado, for Petitioner.

M. Patricia Smith, Solicitor of Labor, Heidi W. Strassler, Associate Solicitor, W. Christian Schumann, Counsel, Appellate Litigation, Cheryl C. Blair-Kijewski, Attorney, U.S. Department of Labor, Office of the Solicitor, Arlington, Virginia, for Respondents.

---

[*]    After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Before **KELLY**, **MURPHY**, and **HOLMES**, Circuit Judges.

**MURPHY**, Circuit Judge.

Mainline Rock and Ballast, Inc. ("Mainline Rock") seeks review of two civil penalties assessed by the Mine Safety and Health Administration ("MSHA") for regulatory violations stemming from an accident at Mainline Rock's Torrance Quarry. The accident resulted in serious injuries to a miner who contacted a moving part of a conveyor belt. An MSHA inspector cited Mainline Rock for failing to install a protective guard around the moving part as required by 30 C.F.R. § 56.14107(a), and for failing to timely notify the MSHA of the accident pursuant to 30 C.F.R. § 50.10. Mainline Rock challenged the citations, but an administrative law judge ("ALJ") of the Federal Mine Safety and Health Review Commission ("Commission") affirmed the penalties, and the Commission declined review. We have jurisdiction under 30 U.S.C. § 816(a)(1) and affirm the penalty assessments.

## BACKGROUND

Mainline Rock operates a ballast quarry in New Mexico known as the Torrance Quarry. To transport ballast from the quarry, Mainline Rock uses conveyor belts constructed of steel I-beams and spinning metal rollers. The conveyor belt implicated in this case, known as the Grizzly Conveyor, is four feet

-2-

wide and stands thirty-three inches above the ground. Steel I-beams frame the belt, which runs along a series of four-foot wide metal rollers. The rollers suspend the belt and ballast, and after rock is delivered from the belt, the belt returns along the undercarriage of the conveyer suspended by five-inch diameter spinning "return rollers." The accident that gave rise to this case occurred when a miner, Edelberto Avitia, was pulled into the conveyor by one of these return rollers.

The precise manner in which Avitia was drawn into the conveyor by the roller was the subject of some controversy. Before the ALJ, Avitia testified that a coworker, Jeremiah Carpio, had told him that Mine Superintendent Mike Harris wanted him to shovel dirt and rock that fell off the Grizzly Conveyor. To do this job, which was a routine task, Avitia knelt next to the conveyor and shoveled beneath it by extending his arms up to his shoulders. He did not know how he was caught by the roller, but he speculated that his clothing or shovel must have come into contact with it. The ALJ, however, found that Avitia had positioned himself underneath the conveyor to remove rock or material that had become lodged in the conveyor frame. The ALJ determined that while under the conveyor, Avitia's shovel contacted the spinning roller, which instantly drew him in between the belt and roller. Avitia testified that when contact was made, he felt the impact and blacked out. When he regained consciousness, he found himself pinned in the air between the return roller and the belt, with the roller

below his stomach and the belt still running along his back. His head and torso had passed through a seven-inch space.

Avitia estimated that he spent the next twenty minutes trying to signal for help. Because he was trapped under the conveyor frame, within reach of the ground, Avitia managed to retrieve his radio and tell other miners to stop the conveyor. He testified that he yelled, "Stop everything . . . . I'm dying. I'm stuck in a belt." R., Vol. 2 at 70. Another miner heard his pleas, stopped the conveyor, and unsuccessfully tried to extricate Avitia by cutting the belt. Carpio, meanwhile, called 911, and another miner used a torch to cut the roller from the conveyor. When Avitia was finally freed, the other miners began removing his clothes, while Harris, who had arrived on the scene, began administering oxygen. Harris told Avitia that he would be all right, but Avitia replied, "No, I'm in very bad shape." R., Vol. 2 at 106 (internal quotation marks omitted).

During the ordeal, Mine Load-out Superintendent Dwayne Olsen learned there had been an accident. Olsen had been working some 1500 feet away, and when he arrived on scene, Avitia was laying on the ground with his head in another miner's lap. Olsen took a "quick glance" at Avitia, *id.*, Vol. 3 at 460, and noticed that he looked pale. Olsen described Avitia's face as "kind of swollen" and his head as "misshaped." *Id.* at 461. Olsen spoke to no one and asked no questions. After staying at the scene for "[s]econds," *id.* at 460, he went to his office to call Mainline Rock's corporate counsel, the company's compliance

officer, and 911. At no point did Olsen make any inquiries of Avitia's condition. Nor did he report the accident to MSHA until after Avitia was airlifted to a hospital. By Olsen's account, the total time from when he first learned of the accident until he reported it to MSHA was approximately one hour and thirty-eight minutes. *See* Joint App. at 90-91.

Avitia spent two-and-a-half months in the hospital recovering. He sustained severe internal injuries requiring a tracheotomy and surgery to his pelvis, pancreas, hip, and spleen. Avitia suffered permanent damage to his kidneys and also broke his arm, his collarbone, and all of his ribs.

The ensuing MSHA investigation resulted in two citations against Mainline Rock. The first was for a violation of the mandatory safety standard imposed by 30 C.F.R. § 56.14107(a), which requires that all moving machine parts be guarded. An MSHA inspector determined that Mainline Rock should have had a guard installed around the return roller. The ALJ affirmed the citation and concluded that Mainline Rock exhibited high negligence by failing to guard the roller given testimony that shoveling beneath the conveyor was a routine task and inspectors had previously warned the company to guard its return rollers. The second citation was assessed for failing to report the accident to MSHA within fifteen minutes, as required by 30 C.F.R. § 50.10. In affirming this citation, the ALJ similarly determined that Mainline Rock exhibited high negligence because a reasonable person would have called MSHA upon seeing Avitia at the scene, but

Olsen remained "remarkably non-inquisitive about Avitia's condition and injuries." Joint. App. at 130. The two penalties totaled $66,000.

## DISCUSSION

Because the Commission declined to review the ALJ's decision, the ALJ's decision stands as the final administrative order. 30 U.S.C. § 823(d). We review the ALJ's factual findings to ensure they are supported by substantial evidence. *Id.* § 816(a)(1); *Plateau Mining Corp. v. Fed. Mine Safety & Health Review Comm'n*, 519 F.3d 1176, 1191 (10th Cir. 2008). We review the ALJ's legal conclusions de novo. *Olson v. Fed. Mine Safety & Health Review Comm'n*, 381 F.3d 1007, 1011 (10th Cir. 2004).

### A. 30 C.F.R. § 56.14107 - Failure to Guard Moving Machine Parts

1. Applicability of Mandatory Safety Standard

We first consider Mainline Rock's contention that the mandatory safety standard of 30 C.F.R. § 56.14107(a) does not apply to the roller cited in this case. The full text of the regulation provides:

30 C.F.R. § 56.14107 Moving Machine Parts

(a) Moving machine parts shall be guarded to protect persons from contacting gears, sprockets, chains, drive, head, tail, and takeup pulleys, fly-wheels, couplings, shafts, fan blades, and similar moving parts that can cause injury.

(b) Guards shall not be required where the exposed moving parts are at least seven feet away from walking or working surfaces.

The agency has explained that this "standard requires the installation of guards to protect persons from coming into contact with hazardous moving machine parts. The standard clarifies that the objective is to prevent contact with these machine parts. The guard must enclose the moving parts to the extent necessary to achieve this objective." *Safety Standards For Loading, Hauling, and Dumping and Machinery and Equipment at Metal and Nonmetal Mines*, 53 Fed. Reg. 32496, 32509 (Aug. 25, 1988). Both the regulation and the explanation clearly require guards around moving parts, and "[w]hen the meaning of a regulatory provision is clear on its face, the regulation must be enforced in accordance with its plain meaning," *Walker Stone Co. v. Sec'y of Labor*, 156 F.3d 1076, 1080 (10th Cir. 1998).

Mainline Rock argues, however, that the standard does not apply to this specific roller because Avitia was trained not to dig under the conveyor while it was operating, but he intentionally stuck his shovel into the conveyor. Mainline Rock interprets the standard to exclude intentional conduct because contact is always possible through intentional conduct.

To the extent Mainline Rock attempts to equate intentional conduct with intentional contact, its interpretation is absurd. *See id.* at 1082 (rejecting interpretation that would lead to "anomalous results"). Avitia may have exhibited intentional conduct by going beneath the conveyor and attempting to dislodge a rock, but that does not mean he intentionally contacted the roller in disregard of

the near-lethal consequences.  Simply put, the standard's objective is to prevent injuries from contact with moving machine parts, most of which occur when "persons [are] performing deliberate or purposeful work-related actions with the machinery."  53 Fed. Reg. 32509.  Mainline Rock's interpretation would disregard this objective and leave unprotected those workers who accidentally contact a hazardous moving machine part while performing some intentional work-related activity.  We decline to adopt an interpretation that "would defeat the safety promoting purposes of the regulation."  *Walker*, 156 F.3d at 1082.

Moreover, while Mainline Rock insists that an employee's intentional contact is not covered by the standard, its authorities deal with regular inspection or maintenance of the hazardous machine part.  *See, e.g., Sec'y of Labor v. Brown Bros. Sand Co.*, 17 FMSHRC 578, 579-80 (1995).  But even in the maintenance context, if an employee is subjected to a reasonable possibility of contact and injury, the guarding standard remains applicable.  *See, e.g., Sec'y of Labor v. Thompson Bros. Coal Co.*, 6 FMSHRC 2094, 2097 (1984) (affirming guarding violation of similar regulation).  Of course, there are some instances in which a guard would serve almost no purpose because maintenance personnel must, by the nature of their work, intentionally access the hazardous part to perform their job; under those circumstances, the guarding standard is inapplicable so long as the employee has mitigated any reasonable possibility of injury.  *See Brown Bros.*

*Sand*, 17 FMSHRC at 579-80 (vacating guarding citation under another regulation, where hazardous parts were accessed exclusively by maintenance personnel who could perform the required task only by shutting down machine). But those circumstances differ markedly from the ones before us, which fall squarely within the standard, *see id.* at 581 (stating that "inadvertent contact" with a moving part is "the precise hazard . . . the guarding standard seeks to prevent").

Additionally, the ALJ's conclusion is bolstered by the Commission's interpretation of a similar regulation, 30 C.F.R. § 77.400, which requires that guards be installed around moving machine parts at surface coal mines.[1] Recognizing that this regulation applies where moving parts "'may be contacted'" and "'may cause injury,'" the Commission explained that the standard "imports the concepts of reasonable possibility of contact and injury, including contact stemming from inadvertent stumbling or falling, momentary inattention, or ordinary human carelessness." *Thompson Bros. Coal*, 6 FMSHRC at 2097. To determine whether the standard applies, the Commission outlined several factors,

---

[1]     The relevant portion of the regulation provides:

§ 77.400 Mechanical equipment guards.

(a) Gears; sprockets; chains; drive, head, tail, and takeup pulleys; flywheels; couplings; shafts; sawblades; fan inlets; and similar exposed moving machine parts which may be contacted by persons, and which may cause injury to persons shall be guarded.

including the "accessibility of the machine parts, work areas, ingress and egress, work duties, and, as noted, the vagaries of human conduct." *Id.*

Avitia testified that he was instructed to shovel dirt and rock that fell off the conveyor. He stated that this was a routine task he performed by kneeling beside the conveyor to shovel beneath it. The ALJ found that Avitia went under the conveyor, which, given its height (33 inches), was not a difficult place to be: "[T]he only impediment to access the return roller was minimal and insubstantial; simply bending over at the waist, not crawling, afforded access." Joint App. at 121. Given these facts, it was entirely foreseeable that a miner could contact the roller.

Still, Mainline Rock asserts the roller was exempt from the standard under 30 C.F.R. § 56.14107(b), which provides an exception for "exposed moving parts [that] are at least seven feet away from walking or working surfaces." According to Mainline Rock, the roller was "guarded by location" because it was situated within the I-beam structure of the conveyor. This argument is meritless, however, because there is no evidence that the roller was seven feet from walking or working surfaces. *See* 53 Fed. Reg. 32509 ("[G]uarding by location is recognized as an alternative to a physical guard in instances where the exposed moving parts are elevated at least seven feet above walking or working surfaces."). Rather, the roller was a mere 33 inches off the ground, located in close proximity to where Avitia worked, and almost entirely exposed beneath the conveyor. Mainline Rock

suggests that the roller was inaccessible because it was located out of reach, but the agency has rejected that interpretation as well. *See id.* (explaining that the phrase "located out of reach" "would create uncertainty as to the standard's application" and that "[u]nder the final rule, the standard applies where the moving machine parts can be contacted and cause injury" (internal quotation marks omitted)). In any event, the ALJ recognized that Mainline Rock's photographs of the conveyor demonstrated that the roller was not located out of reach, but rather was quite easily accessible. *See* Joint App. at 121.

Mainline Rock also contends that the standard does not apply because a return roller is not a specifically enumerated part under 30 C.F.R. § 56.14107(a). This argument is readily defeated, however, because in addition to those parts specifically listed, the regulation also applies to "similar moving parts." *Id.* And, the Commission has previously recognized that return rollers are precisely the type of hazardous moving machine part covered by the regulation. *See, e.g., Sec'y of Labor v. Sangravl Co.*, 30 FMSHRC 1111, 1112 (2008).[2]

---

[2] Mainline Rock reiterates an argument rejected by the ALJ, that the MSHA Program Policy Manual provides an exception from the guarding standard for return rollers where skirt boards are present. The ALJ rejected this argument because it was undisputed that no skirt boards were present at the location of the accident. In this court, Mainline Rock claims that Harris actually testified that there were skirt boards on the conveyor. The record indicates, however, that Harris was referring to a "skirt board of the belt and [seven troughing] rollers where the receiving box [was] at." R., Vol. 3 at 320. He was not referring to the location of the conveyor where Avitia was injured, which Mainline Rock's photo clearly depicts without any skirt boarding. *See id.*, Vol. 4, Ex. R-6.

-11-

2.  Notice of Guarding Requirement

Alternatively, Mainline Rock contends that it had inadequate notice that the mandatory safety standard was applicable because MSHA inspectors had never previously cited the company for failing to guard its return rollers and instead indicated that similarly located rollers did not need to be guarded.  We reject this argument for three reasons.  First, the MSHA cannot be estopped from enforcing its regulations simply because it did not previously cite the mine operator.  *See Emery Mining Corp. v. Sec'y of Labor*, 744 F.2d 1411, 1416-1417 (10th Cir. 1984).  "[T]hose who deal with the Government are expected to know the law and may not rely on the conduct of government agents contrary to law."  *Id.* at 1416 (quotation omitted).  Therefore, even if Mainline Rock had been told it did not need to guard the rollers, it would not be absolved of its duty to do so.

Second, and perhaps more importantly, we have explained that regulations provide adequate notice of the regulated conduct, and thus satisfy due process requirements, "so long as they are sufficiently specific that a reasonably prudent person, familiar with the conditions the regulations are meant to address and the objectives the regulations are meant to achieve, would have fair warning of what the regulations require."  *Walker*, 156 F.3d at 1083-84.  Here, we have little difficulty concluding that Mainline Rock had adequate notice of the regulatory

requirements from both the plain language of the regulation and the explanatory notice published by the MSHA.[3]

Third, Mainline Rock had actual notice that the standard applied to return rollers. Indeed, contrary to Mainline Rock's assertion, the record indicates that the MSHA had previously warned the company to guard return rollers. An MSHA supervisor testified that he instructed the inspector to direct Mainline Rock to "start guarding return rollers." R., Vol. 3 at 550. The inspector's subsequent report indicated that Mainline Rock was put on notice of the guarding requirement. *See id.* at 551-53. And Mainline Rock's operations manager confirmed that the inspector had alerted them to the requirement for return rollers and that the company actually installed twenty to thirty guards. *Id.* at 600.[4]

---

[3]     We recognize the Commission has previously determined that 30 C.F.R. § 56.14107(a) is ambiguous and failed to afford a mine operator adequate notice of the extent of the guarding requirement. *See Sec'y of Labor v. Alan Lee Good*, 23 FMSHRC 995 (2001). That case is distinguishable, however, because the ambiguity related to the *extent* of the guarding requirement, not whether a guard was required at all, which is the issue we confront here. *See id.* at 1004 ("[regulation] does not specify the extent of guarding required or explain how moving parts should be guarded"); 1008 ("[regulation] does not make clear how or the extent to which the moving parts should be guarded").

[4]     Mainline Rock contends the government withdrew its argument relating to the notice provided during a February 2009 inspection. *See* Pet'r's Br. at 36 n.13. The ALJ did not deem the argument withdrawn, however; rather, the ALJ observed that the government simply withdrew an exhibit, P-11. *See* R., Vol. 3 at 553-54. The point is inconsequential in any event, because Mainline Rock's operations manager confirmed that the company was put on notice of the guarding requirement at the February 2009 inspection. Mainline Rock's assertion that such notice was insufficient as to the particular roller involved here because it was not identified with the twenty to thirty other rollers is foreclosed by our analysis.

-13-

3. High Negligence

Next, Mainline Rock contends the ALJ erred in concluding that the company exhibited high negligence in failing to install a guard around the return roller. The only argument advanced by Mainline Rock meriting discussion is that the ALJ erred in dismissing its claim that its lock-out/tag-out policy should reduce its level of negligence. The ALJ rejected this argument, finding that an employee's failure to follow lock-out/tag-out procedures has no impact on a guarding violation. The ALJ recognized that Harris testified that Mainline Rock's lock-out/tag-out policy did not apply when an employee was shoveling under an operating conveyor, which Harris readily admitted was a daily job. *See* R., Vol. 2 at 303-04. Given this evidence and other testimony establishing that Mainline Rock knew of the guarding violation, the ALJ's finding of high negligence is supported by substantial evidence.

**B. 30 C.F.R. § 50.10 - Failure to Report Accident**

We next consider Mainline Rock's challenge to the citation assessed for violating 30 C.F.R. § 50.10, which, as is relevant here, requires a mine operator to report an accident to the MSHA within fifteen minutes of an accident that has a reasonable potential to cause death. The citation indicates that the accident occurred at 12:50 PM, Harris learned of the accident at 1:00 PM, but the accident was not reported to the MSHA until 2:42 PM. The text of the regulation states:

§ 50.10 Immediate notification

The operator shall immediately contact MSHA at once without delay
and within 15 minutes at the toll-free number, 1-800-746-1553, once
the operator knows or should know that an accident has occurred
involving:

(a) A death of an individual at the mine;

(b) An injury of an individual at the mine which has a reasonable
potential to cause death;

(c) An entrapment of an individual at the mine which has a
reasonable potential to cause death; or

(d) Any other accident.

The Commission has previously explained the degree of latitude afforded

by § 50.10, balanced against its directive that mine operators act quickly to assess

the severity of an accident that may require reporting:

Section 50.10 . . . necessarily accords operators a reasonable
opportunity for investigation into an event prior to reporting to
MSHA.  Such internal investigation, however, must be carried out by
operators in good faith without delay and in light of the regulation's
command of prompt, vigorous action.  The immediateness of an
operator's notification under section 50.10 must be evaluated on a
case-by-case basis, taking into account the nature of the accident and
all relevant variables affecting reaction and reporting.

*Sec'y of Labor v. Consol. Coal Co.*, 11 FMSHRC 1935, 1938 (1989).

Mainline Rock argues that the ALJ erred in affirming the citation because

when Olsen saw Avitia, there were no obvious signs of trauma to signal that he

had suffered an accident with a reasonable potential to cause death.  And when

the life-flight medics informed Olsen of the nature of Avitia's injuries, Olsen

-15-

called the MSHA within fifteen minutes. The ALJ rejected this argument, finding that Olsen remained "remarkably non-inquisitive about Avitia's condition and injuries." Joint. App. at 130. The ALJ explained that § 50.10 affords an operator a degree of discretion, but Olsen did not "have the discretion to remain uninformed about the circumstances of the accident and then assert that the reasonable potential for the accident to cause death was unknown." *Id.*

The ALJ's decision is supported by substantial evidence. After arriving on scene, Olsen merely glanced at Avitia and left seconds later without asking a single question. Despite calling 911 and noting that Avitia's head was misshaped, Olsen never sought an update on Avitia's condition from Harris or anyone else. Mainline Rock asserts that Olsen timely reported the accident after medics told him that Avitia was "in tough shape and had some internal bleeding." R., Vol. 3 at 484. But Harris recounted things differently. Harris said he was frustrated with how uninformed Olsen was when, after Avitia was air-lifted from the mine, he told Olsen that he would "be surprised if [Avitia] live[d] to make it to the hospital." R., Vol. 3 at 400 (internal quotation marks omitted). Olsen was "shocked." *Id.* at 401. And yet it was not until after Harris told him, "We need to get a hold of MSHA," that Olsen finally made the call. *Id.* (internal quotation marks omitted).

Olsen had a reasonable opportunity for investigation but failed to seize it. He easily could have asked what happened and immediately learned that Avitia

-16-

had been pulled through the roller.  That knowledge alone would have alerted him to the severity of the accident and the potential for death.  Another miner at the scene actually thought Olsen left to get more help while he continued "working on trying to save [Avitia's] life."  *Id.*, Vol. 2 at 220-21.  As the ALJ recognized, the obvious circumstances of the accident would have triggered some minimal degree of inquiry in a reasonable person, thus prompting a call to the MSHA.  But Olsen chose to remain blind to those circumstances.  Olsen's ignorance of the severity of Avitia's condition did not excuse Mainline Rock's failure to timely report the accident.

## CONCLUSION

The ALJ's civil penalty assessments are AFFIRMED.