UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-1321**

CONSOL BUCHANAN MINING COMPANY, LLC,

      Petitioner,

      v.

SECRETARY OF LABOR; FEDERAL MINE SAFETY & HEALTH REVIEW
COMMISSION; FEDERAL MINE SAFETY & HEALTH ADMINISTRATION,

      Respondents.

On Petition for Review of an Order of the Federal Mine Safety
and Health Review Commission. (VA 2013-190)

Argued: September 22, 2016      Decided: November 10, 2016

Before WILKINSON, DUNCAN, and WYNN, Circuit Judges.

Petition for review denied by published opinion. Judge Wynn
wrote the opinion, in which Judge Wilkinson and Judge Duncan
joined.

**ARGUED:** Billy Ray Shelton, JONES, WALTERS, TURNER & SHELTON
PLLC, Lexington, Kentucky, for Petitioner. Cheryl C. Blair-
Kijewski, UNITED STATES DEPARTMENT OF LABOR, Arlington,
Virginia, for Respondents. **ON BRIEF:** Randall C. Eads, EADS &
EADS, Abingdon, Virginia, for Petitioner. M. Patricia Smith,
Solicitor of Labor, Office of the Solicitor, Washington, D.C.,
Heidi W. Strassler, Associate Solicitor, Office of Civil Penalty
Compliance, MSHA, W. Christian Schumann, Appellate Litigation,

UNITED STATES DEPARTMENT OF LABOR, Arlington, Virginia, for Respondent, Secretary of Labor.

WYNN, Circuit Judge:

Following a fatal accident in a coal mine operated by Consol Buchanan Mining Co. ("Consol"), the Federal Mine Safety and Health Review Commission (the "Commission") determined that the accident resulted from Consol's "unwarrantable failure" to ensure that certain equipment in the mine was maintained in a safe, working condition. Seeking review by this Court, Consol argues that it lacked notice that hazardous conditions in the mine violated applicable mine safety regulations. Further, Consol asserts that the agency erred in concluding that the company demonstrated aggravated negligence in failing to rectify evident safety concerns. We disagree and therefore deny Consol's petition for review.

I.

A.

Consol operates a large underground coal mine in Buchanan, Virginia. On January 11, 2012, acting Shift Foreman Lynn Semones directed Section Foreman Gregory Addington and miners David Green and Joseph Saunders to move a shuttle car from one part of the mine to another. In general, foremen were not assigned to assist with such a move. Recognizing Addington's lack of experience moving equipment, however, Semones assigned Addington to oversee this particular move to "get him some

3

experience" with the process.  J.A. 656.  Semones directed Addington to "[f]ollow [Green and Saunders], learn from them, [and] help them [move the car] through tight places."  Id.

At the time of the accident, a six-inch water supply line ran along the mine floor immediately adjacent to the trackway on which miners moved equipment through the mine.  Though originally situated above the mine floor, this waterline was effectively buried by the accumulation of years of dust and debris from the mine.  As the mine's main water supply, the line supplied water for various uses throughout the mine, including firefighting and the suppression of coal dust generated through the mining process.

To enable these distinct uses, multi-outlet water manifolds were installed at regular intervals along the line.  Connected to each manifold were valves, each of which could be adjusted to control the flow of water for a designated purpose.  Separately, to stem the flow of water entirely, the main six-inch waterline included larger shutoff valves.  These valves were arranged in a "ladder system," such that three separate valves had to be closed to fully stop the flow of water to a particular section of the line.  J.A. 40.

Due to their proximity to the trackway, machinery regularly struck the manifolds and valves extending from the main waterline as the machinery moved through the mine.  Though aware

4

that fire valves were occasionally damaged by moving equipment, Semones did not instruct Addington on how to respond to such an incident, instead relying on the miners' prior experience to ensure that the move was accomplished safely. Nonetheless, aware of the possibility that the passing shuttle car may damage a protruding valve, Addington looked unsuccessfully for replacement valves before joining the move crew.

B.

Soon after the crew began to move the shuttle car, the car struck a fire valve connected to a manifold extending from the main waterline, breaking the valve in two and leaving a fountain of water shooting from the manifold. While Addington dried himself, Green and Saunders set about to stop the flow of water and repair the broken valve. To do so, Green and Saunders, along with a third miner, first sought to close the shutoff valves on the main six-inch waterline. Because Consol had removed the "leverage bars" provided by the valve manufacturer to assist in opening and closing the valves, the miners attempted to close the valve using a nearby steel bar.

As the miners worked to close the shutoff valves, Addington contacted Semones to report the accident. Semones later recounted that he directed Addington to continue moving the shuttle car to allow a second crew to repair the damaged valve.

5

Addington testified, however, that he did not hear Semones's instruction. At any rate, rather than following this direction, Addington returned to the scene of the accident and found Green and Saunders working to reassemble the broken fire valve. Assuming the miners knew how to repair the valve, Addington watched as Green and Saunders worked to reattach the valve to the manifold.

Unfortunately, due to the accretion of debris on the main waterline, the miners were unable to fully close one of the shutoff valves. With the valve partially open, water continued to flow through the manifold as the miners attempted to reattach the broken fire valve.[1] At the same time, the dislocation of the fire valve from the manifold damaged the valve's threading such that it could no longer bear the level of water pressure it was designed to withstand. Although the miners visually inspected the threading before attempting to reattach the valve, investigators later determined that the damage to the threading was difficult to detect without magnification. Saunders was unable, however, to reattach the valve by hand and instead used a pipe wrench to attempt to tighten the valve into place.

Ultimately, the damage to the threading, coupled with the building water pressure, caused the valve to fail. As a result,

---

[1] Addington later testified that he believed that water flowing through the manifold was simply a reservoir in the waterline that remained after the shutoff valves were closed.

the valve was suddenly ejected from the manifold, striking Saunders and fatally injuring him. A Mine Safety & Health Administration ("MSHA") investigator who arrived at the scene soon thereafter observed a fountain of water flowing from the manifold and concluded that one of the shutoff valves was not fully closed. Upon further inspection, the investigator noted that the shutoff valve remained visually and audibly (that is, making a hissing sound) open. A more extensive MSHA inquiry followed, with investigators concluding that the accident resulted from the failure to ensure that the shutoff valve was fully closed before attempting to reattach the inoperable fire valve.

C.

Following its investigation, MSHA petitioned the Commission to assess civil penalties against Consol for violations of two mine safety regulations: (1) 30 C.F.R. § 75.1725(a) (the "Mining Equipment Rule"), which requires mine operators to remove unsafe mining machinery or equipment from service, for reusing the damaged fire valve after it was dislocated from the water manifold; and (2) 30 C.F.R. § 75.1100-3 (the "Fire Equipment Rule"), which requires all firefighting equipment to be maintained in a usable and operative condition, for failing to ensure leverage bars were available to be used to close the

7

shutoff valves and otherwise failing to ensure that the valves could be fully closed.

After conducting an evidentiary hearing, at which the parties presented testimony from MSHA inspectors and the miners involved in the accident, an MSHA Administrative Law Judge ("ALJ") upheld the investigators' findings and concluded that each of the violations stemmed from Consol's "unwarrantable failure" to comply with the identified MSHA regulations. Pursuant to Section 104(d)(1) of the Mine Act, 30 U.S.C. § 814(d)(1), the ALJ imposed a civil penalty of $70,000 for each violation. The Commission subsequently denied Consol's petition for discretionary review, and the ALJ's decision thus became a final Commission order on March 4, 2015.

Consol now petitions this Court for review and challenges the Commission's final order on three grounds. First, the company contends that it lacked fair notice that using an inoperable shutoff valve violated the Fire Equipment Rule because MSHA had not previously cited Consol for failing to ensure that shutoff valves on the mine's central waterline could be closed. Second, asserting that Addington was not responsible for supervising Green and Saunders in their efforts to repair the damaged fire valve, Consol challenges the ALJ's conclusion that Addington served as Consol's agent, such that any negligence attributable to him may be imputed to Consol. Last,

8

Consol contests the ALJ's ultimate finding that Consol demonstrated heightened negligence in failing to comply with applicable MSHA regulations.

## II.

Because the Commission adopted the ALJ's factual findings, we review those findings under a substantial evidence standard. Knox Creek Coal Corp. v. Sec'y of Labor, Mine Safety & Health Admin., 811 F.3d 148, 157 (4th Cir. 2016); see also 30 U.S.C. § 816(a)(1) (providing that the Commission's findings are "conclusive" if they are "supported by substantial evidence on the record considered as a whole"). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Almy v. Sebelius, 679 F.3d 297, 301 (4th Cir. 2012) (internal quotations omitted) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). We review the Commission's legal conclusions de novo, affording deference when appropriate to the Secretary's interpretations of ambiguous statutory language. Knox Creek Coal, 811 F.3d at 157 (citing Sec'y of Labor ex rel. Wamsley v. Mut. Mining, Inc., 80 F.3d 110, 113–15 (4th Cir. 1996)).

A.

Congress enacted the Mine Act to address the "urgent need to provide more effective means and measures for improving the working conditions and practices" in the nation's mines. 30 U.S.C. § 801(c). In so doing, Congress made plain that the "first priority and concern of all in the coal . . . mining industry must be the health and safety of its most precious resource—the miner." Id. § 801(a). To that end, Congress explained that mine operators "have the primary responsibility to prevent the existence of" dangerous conditions in their mines. Id. § 801(e). The Act also authorizes the Secretary of Labor to adopt "mandatory health or safety standards for the protection of life and prevention of injuries in coal or other mines." Id. § 811(a).

Promulgated pursuant to this rulemaking authority, the Fire Equipment Rule requires mine operators to ensure that "[a]ll firefighting equipment . . . be maintained in a usable and operative condition." 30 C.F.R. § 75.1100-3. MSHA regulations explicitly include "waterlines" among designated "firefighting equipment" that must be installed in all covered mines. See id. § 75.1100-1(a) (requiring lines capable of delivering 50 gallons of water a minute at a nozzle pressure of 50 pounds per square inch). Similarly, the Mining Equipment Rule provides that all "[m]obile and stationary machinery and equipment shall be

10

maintained in safe operating condition and machinery or equipment in unsafe condition shall be removed from service immediately." Id. § 75.1725(a).

The Mine Act further authorizes the Secretary, acting through MSHA, to conduct inspections to assess compliance with mine safety regulations. 30 U.S.C. § 813(a). Beyond these regular inspections, the Act mandates quarterly inspections of each underground coal mine "in its entirety." Id. MSHA inspectors are responsible for issuing citations for any identified violations and otherwise assisting mine operators in complying with applicable regulations. Id. §§ 813(a), 814(a). Where, as here, investigators determine that a violation is either "of such a nature as could significantly and substantially contribute to the cause and effect of a . . . mine safety or health hazard" or otherwise "caused by an unwarrantable failure of [the] operator to comply with [MSHA] mandatory health or safety standards," these findings must be included in any resulting citation and may lead to enhanced penalties and other potential sanctions. See id. §§ 814(d)(1), (d)(2), (e).

B.

Consol first contends that it lacked adequate notice that MSHA interpreted the Fire Equipment Rule to require mine

11

operators to maintain shutoff valves on central waterlines in operable condition. As a result, Consol asserts that it was deprived of due process before facing civil penalties for failing to ensure that the damaged shutoff valve at issue here could be fully closed. We disagree.

The Due Process Clause of the Fifth Amendment protects parties from being deprived of property without fair notice. U.S. Const. amend. V; United States v. Hoechst Celanese Corp., 128 F.3d 216, 224 (4th Cir. 1997). For this reason, and in light of the "quasi-criminal" nature of civil penalties, we have long recognized that "parties subject to . . . administrative sanctions are entitled to . . . 'clear notice'" of what conduct is proscribed by a regulation before being subject to monetary penalties for a particular violation. Id. (quoting First Am. Bank of Va. v. Dole, 763 F.2d 644, 651 n.6 (4th Cir. 1985)). Whether a sanctioned party had adequate notice of a particular violation turns on the "relevant facts of each case." Id. (citing United States v. Bennett, 984 F.2d 597, 605 (4th Cir. 1993)).

Here, the ALJ explained that the Consol's violation of the Fire Equipment Rule involved two interrelated issues. First, and most significantly, accumulated material on the exterior of a shutoff valve on the main six-inch waterline prevented the valve from fully closing, permitting water to continue to flow

12

into the damaged manifold as the miners attempted to reassemble the severed fire valve. Second, lacking manufacturer-provided leverage bars, the miners were unable to close the valve fully before attempting to reinstall the fire valve.

The parties agree that, prior to the accident, MSHA never alerted Consol that the agency viewed the condition of shutoff valves in the mine as a violation of the Fire Equipment Rule. Absent explicit prior notice, the Commission employs a "reasonably prudent miner" test to determine whether the operator nonetheless had sufficient notice of the risk of civil penalties arising from a violative condition. DQ Fire & Explosion Consultants, Inc., 36 FMSHRC 3083, 3087–88 (Dec. 2014); LaFarge N. Am., 35 FMSHRC 3497, 3499–500 (Dec. 2013). Under this standard, the Commission considers "whether a reasonably prudent person familiar with the mining industry and the protective purposes of the standard would have recognized the specific prohibition or requirement of the standard." DQ Fire & Explosion Consultants, 36 FMSHRC at 3087 (internal quotations omitted) (quoting Ideal Cement Co., 12 FMSHRC 2409, 2416 (Nov. 1990)).

Although we have yet to adopt the reasonably prudent miner test, our Sister Circuits have used this objective test in considering whether MSHA regulations provide adequate notice of proscribed conduct. See, e.g., Black Beauty Coal Co. v. Fed.

13

Mine Safety & Health Review Comm'n, 703 F.3d 553, 558 (D.C. Cir. 2012); Mainline Rock & Ballast, Inc. v. Sec'y of Labor, 693 F.3d 1181, 1187 (10th Cir. 2012); Stillwater Min. Co. v. Fed. Mine Safety & Health Review Comm'n, 142 F.3d 1179, 1182 (9th Cir. 1998). This test's emphasis on the reasonably foreseeable scope of regulatory directives derives in part from the recognition that administrative agencies tasked with carrying out wide-ranging health and safety statutes cannot anticipate every danger that may arise under their purview. See Freeman United Coal Min. Co. v. Fed. Mine Safety & Health Review Comm'n, 108 F.3d 358, 362 (D.C. Cir. 1997).

By the same token, a rule requiring explicit notice of any conceivable violation as a condition of imposing civil sanctions would leave open "large loopholes allowing conduct which should be regulated to escape regulation." Id. (internal quotations omitted) (quoting Ray Evers Welding Co. v. OSHRC, 625 F.2d 726, 730 (6th Cir. 1980)); Phillips v. Interior Bd. of Mine Operations Appeals, 500 F.2d 772, 778 (D.C. Cir. 1974) ("Sporadic federal inspections can never be frequent or thorough enough to insure compliance."). Such a rule likewise would contradict Congress's admonition that miners and mine operators themselves are primarily responsible for ensuring that their mines are safe. 30 U.S.C. § 801(e); Power Fuels, LLC v. Fed. Mine Safety & Health Review Comm'n, 777 F.3d 214, 217 (4th Cir.

14

2015); see also Dickenson-Russell Coal Co., LLC v. Sec'y of Labor, 747 F.3d 251, 254 (4th Cir. 2014) (observing that a rule holding MSHA inspectors principally responsible for mine safety "would be manifestly unreasonable and unjustified in light of the clear Congressional purpose to ensure that the primary responsibility for safety remains with the mine owners and miners") (internal quotations and alterations omitted) (quoting Myers v. United States, 17 F.3d 890, 904 (6th Cir. 1994))). For these reasons, we agree with the Commission and our Sister Circuits that MSHA regulations that permit a reasonably prudent person familiar with the mining industry and the health and safety objectives of the Mine Act to determine what conduct is required or prohibited provide sufficient notice to mine operators to satisfy due process and support potential sanctions.

Acknowledging that this objective standard applies, Consol nonetheless argues that it lacked fair notice that its conduct violated the Fire Equipment Rule in this case. Specifically, Consol argues that MSHA inspectors were aware that Consul removed leverage bars provided by the shutoff valve manufacturer soon after the valves were installed. Yet, according to Consol, MSHA inspectors had never identified the bars' absence as a violation of the rule prior to the accident. According to Consol, the agency's failure to identify this known condition as

a violation left Consol without fair notice that failing to provide the bars would result in civil sanctions.

In support, Consol notes that the Commission has held that prior inconsistent enforcement has a role, in appropriate circumstances, in determining whether a mine operator has fair notice of a potential violation. See Alan Lee Good, 23 FMSHRC 995, 1005 (Sept. 2001) (explaining that "the consistency of the agency's enforcement" is one of a "wide variety of factors" considered by the Commission). We agree that an affirmative statement from a regulatory body empowered to implement and enforce a particular regulatory scheme may be sufficient to deprive regulated parties of clear notice of a later, conflicting interpretation. See Hoechst Celanese Corp., 128 F.3d at 224-27 (finding lack of fair notice where state agency exercising delegated federal authority provided waiver of federal air quality standards based on interpretation later rejected by federal regulators).

Here, however, Consol asks us to go a step further by suggesting that prior inaction is sufficient to deprive an operator of notice. We decline to do so. As previously noted, it is the operator that bears principal responsibility for providing safe working conditions in a mine. 30 U.S.C. § 801(e). Although MSHA investigators are required to issue citations for known violations, id. §§ 813(a), 814(a), Consol

16

offers no support for the proposition that, absent prior enforcement, the agency is precluded from seeking civil penalties related to a particular violation. Quite the opposite: because even the most stringent investigation may fail to identify every potential violation, the objective test we adopt today ensures that MSHA may take action to correct violations that would be apparent to a reasonably prudent miner.

Moreover, although the lack of leverage bars contributed to the miners' inability to close the valve fully, the ALJ concluded that the "sole reason the valve did not close . . . was the accumulation of material around the handle stop." J.A. 858 (emphasis added). In fact, investigators determined after the accident that the valve could not be fully closed even under significant force. For this reason, MSHA's failure to recognize the absence of leverage bars prior to the accident does not call into question the ALJ's finding that a reasonably prudent miner would have recognized that an inoperable shutoff valve must be replaced under MSHA's Fire Equipment Rule.

Resisting this conclusion, Consol argues that it lacked notice that the shutoff valves themselves qualified as "firefighting equipment" within the meaning of the rule. Specifically, Consol emphasizes that the valves control the flow of water through the mine's central waterline, which delivers water for a variety of purposes throughout the mine. In

17

Consol's view, the valves thus do not qualify as "firefighting equipment" and, to the extent that MSHA now contends that they do, Consol lacked notice that the agency interpreted the Fire Equipment Rule to encompass the valves.

As an initial matter, we reject Consol's contention that shutoff valves on a mine's central waterline do not qualify as "firefighting equipment." There is ample evidence in the record to demonstrate that such valves are an integral element of a mine's fire suppression system. For example, the ALJ noted that the valve involved in the accident at issue was included on the mine's fire protection map. Further, as previously explained, MSHA regulations specifically include waterlines among required firefighting equipment, with MSHA requiring that these lines be capable of delivering specified flow-rates to ensure that fires may be effectively extinguished. 30 C.F.R. § 75.1100-1(a). At oral argument, counsel for Consol acknowledged that, had miners been unable to fully open a shutoff valve, the flow of water may fall below these minimum thresholds, violating the Fire Equipment Rule. Much the same, here, damage to the shutoff valve led directly to a catastrophic failure of the fire valve, which Consol acknowledges constitutes a piece of "firefighting equipment." For this reason, Consol's effort to distinguish between covered waterlines and the valves that control the flow of water through those lines is unavailing.

18

Moreover, we are unpersuaded that Consol lacked fair notice that the failure to replace an inoperable shutoff valve would violate the Fire Equipment Rule. Unlike the leverage bars, Consol does not suggest that MSHA was aware that shutoff valves could not be fully closed. On the contrary, the evidence demonstrates that the valve's defective condition became reasonably apparent only after miners attempted to close the valves at the time of the accident. Nonetheless, Consol's assertion that the ALJ improperly focused on the moments immediately preceding the accident misses the mark. Indeed, it is likely often the case that the specific conditions rendering a piece of equipment inoperable become apparent only under certain circumstances. As such, that neither MSHA nor the operator previously noted a particular violation has little bearing on whether, upon realizing that a valve could not be fully closed, a reasonably prudent miner would recognize that the valve was inoperable and must be removed from service.

In sum, the record evidence demonstrates that a reasonably prudent miner would recognize that using inoperative shutoff valves violated MSHA regulations and placed miners at risk. Consequently, Consol had fair notice that the failure to replace defective shutoff valves raised the possibility of sanctions, and MSHA is therefore not barred from seeking civil penalties in connection with this violation.

19

C.

Consol next challenges the ALJ's conclusion that Addington was acting as Consol's agent at the time of the accident, such that any negligence attributable to him in connection with the accident may be imputed to Consol. Again, Consol is mistaken.

Under the Mine Act, a mine operator may be held responsible for the knowledge and negligence of any person who qualifies as the operator's "agent" within the meaning of the statute. See Capitol Cement Corp. v. Sec'y of Labor, Mine Safety & Health Admin., 229 F.3d 1141, 2000 WL 1205389 at *4 (4th Cir. 2000) (per curiam) (citing Sec'y of Labor v. Southern Ohio Coal Co., 4 FMSHRC 1458, 1463 (Aug. 1982)). The Act defines "agent" to mean "any person charged with responsibility for the operation of all or a part of a coal or other mine or the supervision of the miners in a coal or other mine." 30 U.S.C. § 802(e).

We have explained that this "broad definition of agent indicates that Congress did not intend to limit the vicarious liability of an owner or lessee to common law concepts of agency." Bituminous Coal Operators' Ass'n v. Sec'y of Interior, 547 F.2d 240, 247 (4th Cir. 1977). And, in applying this definition, the Commission and other Circuits have focused on whether the miner exercised managerial or supervisory responsibilities at the time of his negligent conduct. Martin Marietta Aggregates, 22 FMSHRC 633, 637-38 (May 2000));

20

see also <u>Original Sixteen to One Mine, Inc. v. Fed. Mine Safety & Health Admin.</u>, 175 F. App'x 825, 827 (9th Cir. 2006).

Applying this standard here, the ALJ concluded that Addington served as a supervisor—and therefore was Consol's "agent"—when he oversaw the miners' efforts to repair the damaged fire valve. In reaching this conclusion, the ALJ acknowledged that Addington had never overseen an equipment move, but noted that Semones expected Addington to act as a foreman during the move. The ALJ further observed that the other testifying miners referred to Addington as the "boss" and agreed that he was in charge of Green and Saunders as they moved the shuttle car through the mine. J.A. 855. Finally, the ALJ rejected the Consol's suggestion that, because Addington lacked experience moving equipment, he was not in a position to oversee Green and Saunders as they attempted to repair the damaged valve. To so hold, the ALJ explained, would allow mine operators to avoid liability by assigning untrained foreman to oversee tasks with which they are unfamiliar.

On appeal, Consol renews its argument that, lacking experience moving equipment, Addington was not in a position to act as a supervisor at the time of the accident. Consol further notes that miners frequently moved equipment through the mine without the assistance of a foreman, and Addington was assigned to assist Green and Saunders merely to act as an "extra set of

21

eyes" and learn more about moving equipment through the mine. Appellant's Br. at 16. In light of this evidence, Consol faults the ALJ's "conclusory" finding that Addington was acting as Consol's agent at the time of the accident and suggests that the ALJ simply assumed that, as a foreman, Addington was by definition an agent within the meaning of the Mine Act. Id. at 17.

We disagree. The ALJ's conclusion that Addington acted as Consol's agent in responding to the damaged valves is amply supported by the evidence. Importantly, to determine whether Addington's negligence may be imputed to Consol, the parties agree that we must consider whether he "exercised managerial responsibilities at the time of his negligent conduct." Martin Marietta Aggregates, 22 FMSHRC at 638 (citing Rochester & Pittsburgh Coal Corp., 13 FMSHRC 189, 194 (Feb. 1991)). In this light, Consol misplaces reliance on Addington's authority to direct the movement of the shuttle car. Instead, the relevant question is whether the ALJ properly held Consol responsible for Addington's failure to recognize the danger presented by the damaged valves and subsequent failure to respond appropriately to that danger. Pocahontas Fuel Co. v. Andrus, 590 F.2d 95 (4th Cir. 1979) (per curiam) (upholding MSHA orders attributing knowledge of rank-and-file miner assigned to conduct pre-shift safety examination to operator).

22

With this in mind, testimony elicited from the miners provides significant support for the ALJ's findings. In particular, although Semones testified that he did not expect Addington to direct Green and Saunders as they moved the shuttle car, he acknowledged that he expected Addington to act as a foreman during the move. Semones testified that he expected Addington to assign tasks to the other miners; ensure compliance with company policies; remind the other miners to wear safety gear; and, most important, alert Semones in the event of an emergency. See J.A. 686-89. Similarly, although Green and Saunders did not await instructions from Addington before attempting to reassemble the broken fire valve, Green testified that he would not have ignored instructions from Addington and would have stopped working to repair the valve if Addington had directed him to do so. Thus, Green testified that, because Addington did not provide any direction to the contrary, he assumed Addington approved of the miners' efforts to reattach the valve.

In the end, Green's testimony that he would have followed Addington's instructions in the most critical moments preceding the accident—that is, while the miners attempted to repair the damaged fire valve—supports the ALJ's finding that Addington was acting as a supervisor "at the time of his negligent conduct." Original Sixteen to One Mine, 175 F. App'x at 827. Likewise,

23

Addington's testimony that he contacted Semones to report the damaged valve indicates that he understood that he was responsible for managing the miners' response. Finally, the ALJ correctly dismissed Consol's suggestion that, because Addington failed to supervise Green and Saunders more closely as they attempted to repair the valve, he cannot be viewed as Consol's agent.

As such, substantial evidence supports the ALJ's conclusions, and therefore those conclusions are conclusive. Almy, 679 F.3d at 301-02. Accordingly, because Addington was acting as Consol's agent in connection with the accident response, the ALJ properly imputed his knowledge and negligence in connection with the accident to Consol.

D.

Finally, Consol contests the ALJ's finding that both of the violations resulted from Consol's unwarrantable failure to comply with MSHA regulations. As noted, we review these findings "to determine if they are supported by substantial evidence in the record." Windsor Coal Co. v. Sec'y of Labor, 166 F.3d 337 (4th Cir. 1998) (per curiam) (citing authorities).

Under § 104(d) of the Mine Act, civil sanctions resulting from the failure to comply with MSHA health and safety regulations are determined based on the significance of the

24

violation and the degree of negligence exhibited by the operator. See 30 U.S.C. § 814(d)(1). Violations found to be "significant and substantial" or to have resulted from an operator's "unwarrantable failure" to comply with MSHA regulations lead to increased fines and other penalties. Id. §§ 814(d); 30 C.F.R. § 100.3(a), (d), (e); Knox Creek Coal, 811 F.3d at 153; Eagle Energy, Inc. v. Sec'y of Labor, 240 F.3d 319, 321-22 (4th Cir. 2001).

Here, the ALJ found that both of the charged violations resulted from Consol's unwarrantable failure to comply with applicable MSHA regulations.[2] In so doing, the ALJ considered a variety of "aggravating factors" identified by the Commission as relevant to determining whether an operator demonstrates at least a "serious lack of reasonable care" in failing to abide by a particular regulation. J.A. 844.

In general, an "unwarrantable failure" involves "conduct that is 'not justifiable' or is 'inexcusable,'" Windsor Coal Co., 166 F.3d at 337 (quoting Sec'y of Labor v. S & H Mining, Inc., 15 FMSHRC 2387, 2390 (1993))—that is, an operator's "aggravating conduct constituting more than ordinary negligence," Eagle Energy, 240 F.3d at 321-22. The Commission has identified a variety of factors to be considered in

---

[2] The ALJ also found that each of the charged violations was significant and substantial, and Consol does not contest that finding on appeal.

determining whether a violation constitutes an unwarrantable failure to comply. These factors include: "(1) the extent of the violative condition, (2) the length of time that the violative condition existed, (3) whether the violation posed a high degree of danger, (4) whether the violation was obvious, (5) the operator's knowledge of the existence of the violation, (6) the operator's efforts in abating the violative condition, and (7) whether the operator had been placed on notice that greater efforts were necessary for compliance." Wolf Run Mining Co., 35 FMSHRC 3512, 3520 (Dec. 2013) (citing authorities); Black Beauty Coal Co., 703 F.3d at 560.

After reviewing each of these factors in this case, the ALJ concluded that each violation resulted from an unwarranted failure to comply with MSHA regulations. As to the fire equipment violation, the ALJ concluded that the failure to ensure that all shutoff valves on the main waterline could be fully closed "stemmed from extensive underlying negligence." J.A. 866. In particular, the ALJ noted that Consol had long failed to maintain the valve in a clean condition and removed the leverage bars soon after the valve was installed. Moreover, the ALJ explained that, at the time of the accident, the inoperable shutoff valve was obviously open, posing significant danger to surrounding miners. Finally, the ALJ cited Addington's failure to recognize and properly address this

26

danger—negligence, which the ALJ properly imputed to Consul, see supra Part II.C, as further evidence of Consol's negligent failure to replace the damaged shutoff valve before attempting to repair the severed fire valve. Thus, although MSHA had never previously cited Consol's failure to provide leverage bars, the ALJ concluded that this lack of notice was "outweighed by the very significant aggravating factors" counseling in favor of an enhanced penalty. Id.

Likewise, with respect to the Mining Equipment Rule violation, the ALJ explained that, though relatively brief in duration and small in scale, the damage to the fire valve was obvious and presented significant danger to numerous miners. Given that passing machinery frequently struck protruding valves (including at least one prior incident involving a similar, if less severe, injury) and that Addington was aware that this particular valve was damaged but failed to more closely supervise Green and Saunders, the ALJ found that Consol displayed an aggravated lack of due care in failing to remove the damaged valve from service.

Consol contests these findings on two bases. First, Consol argues that the ALJ's finding that the fire valve's inoperability was obvious is not supported by the record. Specifically, Consol notes that the miners were initially able to reattach the valve with a pipe wrench and that MSHA's expert

testified that the damage to the valves was apparent only upon closer investigation. Consol further suggests that signs that the shutoff valve was not fully closed at the time of the accident would not have been apparent in the mine setting.

Again, however, substantial evidence supports the ALJ's conclusions, and thus we may not set them aside on appeal. Windsor Coal Co., 166 F.3d at 337. As to the fire valve, the ALJ relied on testimony from Green that he had to forcibly reattach the damaged valve, as well as testimony from the MSHA inspector that anyone familiar with such a valve would understand that it likely would be damaged under the circumstances, to find that the damage to the threading would have been obvious at the time of the accident. Likewise, the ALJ noted that the valve manufacturer's manual suggests that disassembly of the valve may damage the valve and render it inoperable. The ALJ also relied on the MSHA investigator's testimony that the damaged shutoff valve was audibly and visibly open at the time of the accident, as well as the miners' testimony that water continued to flow out of the manifold as they began to reattach the broken fire valve, to conclude that the shutoff valve was obviously not functioning at the time of the accident. The MSHA inspector likewise testified that a second mine foreman confirmed that the valve was "audibly leaking" soon after the accident. J.A. 86.

28

Second, relying on its earlier argument that Addington did not serve as Consol's agent, Consol suggests that the ALJ improperly considered Addington's knowledge and actions in assessing Consol's negligence in connection with the accident. As previously explained, however, the ALJ did not reversibly err in concluding that Addington qualified as Consol's agent with respect to the miners' response to the damaged fire valve. Supra Part II.C. Moreover, even absent such imputation, the ALJ's unwarranted-failure findings are supported by substantial evidence. As the ALJ explained, the present accident followed an extensive history of similar incidents in the mine. For instance, the mine's safety supervisor testified that he was aware of the risk of damaging fire valves while moving equipment. And other miners agreed that valves were struck frequently by moving equipment. Similarly, the ALJ reasonably concluded that the material on the inoperable shutoff valve would have accumulated over time and would have been readily apparent upon close inspection. In fact, following the accident, Consol took steps to ensure that leverage bars are accessible throughout the mine and rerouted the entire waterline to move it farther away from the haulage track.

In light of the record evidence showing that Consol was or should have been aware of the conditions that led to the accident well before the accident, the ALJ's conclusion that

Consol demonstrated more than ordinary negligence in failing to address these conditions is supported by substantial evidence. Windsor Coal Co., 166 F.3d at 337 (upholding unwarrantable-failure finding where the operator "knew of the problems with [mine equipment, but] failed to take adequate measures to . . . prevent" an obvious danger). Consequently, we affirm the ALJ's findings that the challenged violations stemmed from Consol's unwarrantable failure to comply with applicable MSHA health and safety regulations.

## III.

After carefully considering the record as a whole, we conclude that the ALJ did not err in finding that Consol had fair notice that the dangerous conditions that ultimately led to the avoidable death of a miner constituted an "unwarrantable failure" to comply with applicable mine safety regulations. Accordingly, for the foregoing reasons, the petition for review is denied.

PETITION FOR REVIEW DENIED

30