PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-3078
_____

CONSOL PENNSYLVANIA COAL COMPANY, LLC,
                                        Petitioner

v.

FEDERAL MINE SAFETY AND HEALTH REVIEW
COMMISSION; SECRETARY UNITED STATES
DEPARTMENT OF LABOR,
                                        Respondents
_____

On Petition for Review of a Decision of the
Federal Mine Safety and Health Review Commission
(FCMS-1:  PENN 2014-816)
_____

Argued
June 25, 2019

Before:   JORDAN, BIBAS, and NYGAARD, *Circuit
Judges.*

(Opinion Filed:  October 22, 2019)

_____

James P. McHugh   [ARGUED]
Christopher D. Pence
Hardy Pence
500 Lee Street – Ste. 701
Charleston, WV   25329
        *Counsel for Petitioner*


Ali A. Beydoun
Cheryl C. Blair-Kijewski   [ARGUED]
April E. Nelson
Kate S. O'Scannlain
United States Department of Labor
Office of the Solicitor
201 12th Street South – Ste. 401
Arlington, VA   22202

John T. Sullivan
Federal Mine Safety and Health
   Review Commission
1331 Pennsylvania Avenue, N.W. – Ste. 520N
Washington, DC   20004
        *Counsel for Respondents*
_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

As with many other things, when it comes to mining, it is far better to be safe than sorry.  To monitor and encourage

2

safety, Congress and the Mine Safety and Health Administration ("MSHA") require that mine operators notify MSHA within 15 minutes after the occurrence of an injury having "a reasonable potential to cause death."

This case involves that requirement, as embodied in both a statute and a regulation: 30 U.S.C. § 813(j) and 30 C.F.R. § 50.10(b). Robert Stern, a miner for Consol Pennsylvania Coal Company, LLC ("Consol"), suffered a crushing injury between two multi-ton pieces of mining equipment and quickly exhibited, among other worrying symptoms, signs of internal bleeding. Without delay, Consol got Stern out of the mine and coordinated getting him to a hospital, but it failed to notify MSHA for about two hours. Consequently, MSHA issued a citation to Consol for violating 30 C.F.R. § 50.10(b). The Federal Mine Safety and Health Review Commission (the "Commission") upheld the citation over Consol's protestations.

Consol now petitions for review, challenging several aspects of the Commission's decision. We conclude that the Commission did not err, and we will therefore deny the petition.

## I.      BACKGROUND

### A.      Statutory and Regulatory Background

The Federal Mine Safety and Health Act of 1977 (the "Mine Act" or the "Act"), 30 U.S.C. § 801 *et seq.*, was enacted "for the purpose of improving the working conditions of miners." *Cumberland Coal Res., LP v. Fed. Mine Safety & Health Review Comm'n*, 717 F.3d 1020, 1021 (D.C. Cir. 2013).

3

It created the agency that is now called MSHA and "gave [it] broad authority to ensure the safety of mines[.]" *Big Ridge, Inc. v. Fed. Mine Safety & Health Review Comm'n*, 715 F.3d 631, 635 (7th Cir. 2013). MSHA inspectors act on behalf of the Secretary of Labor and are empowered to issue citations for violations of the Mine Act or regulations promulgated under it. *Cumberland Coal*, 717 F.3d at 1021. "A mine operator can contest a citation before the … Commission …, [which is] an adjudicative agency independent of the Department of Labor." *Sec'y of Labor v. Spartan Mining Co.*, 415 F.3d 82, 83 (D.C. Cir. 2005).

The provision of the Mine Act primarily at issue here is 30 U.S.C. § 813(j). It says that, "[i]n the event of any accident occurring in any coal or other mine, the operator shall notify [MSHA[1]] … and shall take appropriate measures to prevent the destruction of any evidence which would assist in investigating the cause or causes thereof." *Id.* When "the operator realizes that the death of an individual at the mine, or an injury or entrapment of an individual at the mine which has a reasonable potential to cause death, has occurred[,]" the notification must "be provided by the operator within 15 minutes[.]" *Id.* The 15-minute requirement was added by the Mine Improvement and New Emergency Response Act of 2006 (the "MINER Act"), Pub. L. No. 109-236, § 5(a), 120 Stat. 493, 498 (2006). It codified a similar provision that had previously appeared in

---

[1] The statute uses the term "Secretary," 30 U.S.C. § 813(j), referring to "the Secretary of Labor or his delegate[,]" *id.* § 802(a). In this context, MSHA is the Secretary's delegate. 29 U.S.C. § 557a.

4

an MSHA emergency regulation.  S. Rep. No. 109-365, at 13 (2006).

Shortly after the MINER Act became law, MSHA promulgated a final regulatory version of the same notification requirement, codified at 30 C.F.R. § 50.10.[2]  Emergency Mine Evacuation, 71 Fed. Reg. 71,430, 71,430-31, 71,434-36 (Dec. 8, 2006).  That regulation says that an "operator shall immediately contact MSHA at once without delay and within 15 minutes at the toll-free number, 1-800-746-1553, once the operator knows or should know that an accident has occurred involving: … [a]n injury of an individual at the mine which has a reasonable potential to cause death[.]"  30 C.F.R. § 50.10(b).

## B.     Factual Background

On August 12, 2013, at about 3:15 a.m., Stern was crushed between two multi-ton pieces of mining equipment. The mine section supervisor, John McDonald, was notified of the accident within minutes, and he got to the scene three or four minutes later.  When he arrived, Stern told him that "he got pinched," that "he was in a lot of pain[,]" that he could not move his legs, and that he could feel "the pinch" on one of his legs.  (App. at 242, 249.)  Stern also screamed in pain when his legs were moved.

McDonald asked the mine "bunker to call 9-1-1 to get an ambulance running."  (App. at 242.)  He also radioed for

---

[2] We refer to the rulemaking that established that regulation as the "post-MINER Act rulemaking."

Shannon Smith, a "fire boss mine examiner" and EMT,[3] to come to the scene, saying there was "a man crushed[.]" (App. at 209, 211.) Additionally, McDonald and Smith yelled for the "haulage" to be cleared out of the way – as is common in an emergency – to allow Consol to quickly get Stern out of the mine.[4] (App. at 237, 250.)

Smith reached the scene eight to ten minutes after receiving the call. He noticed that Stern's knee had an unnatural bend to it, indicating it was broken, and that Stern could not feel or move that leg. Stern said he was in pain. Smith placed Stern in a neck brace, in case Stern had a spinal injury.

Not all of Stern's symptoms gave cause for concern. For example, Smith told the shift foreman that Stern "was calm, collected, good, no high pulse beat or anything like that." (App. at 267.) And Stern never lost consciousness or the ability to respond to questions coherently, nor did he have any problem with his pulse or breathing.

---

[3] A fire boss mine examiner "examine[s] the whole mine with the provisions of the law" for issues such as safety violations. (App. at 209.) EMTs are emergency medical technicians, sometimes called paramedics. Smith was a licensed EMT, and McDonald had EMT training but was not licensed.

[4] "Clearing the haulage" means to "clear[] the equipment out of the way" within the mine to quicken extraction from the mine. (App. at 134.)

Nevertheless, Smith viewed Stern's injury as "[p]retty bad" and "traumatic," and he later described it as "[t]he worst of the accidents" he had treated – which otherwise mainly consisted of "[b]umps and bruises[.]" (App. at 220-21.) And, in fact, some of Stern's symptoms were alarming. Perhaps most significantly, McDonald and Smith noticed that Stern's stomach was becoming hard and distended. They both recognized that as a sign of internal bleeding.[5] Stern's own fears were plain when he told Smith "[s]omething [along] the lines that if something did happen to [him], please tell [his] wife and family that [he] love[s] them[.]" (App. at 220.)

McDonald and Smith called the bunker to request "Life Flight," a helicopter medevac service. Smith "wanted to err on the side of caution" because he thought internal bleeding was possible, which he acknowledged can lead to death, and he feared "the possibility of – the uncontrollable." (App. at 226, 236.) McDonald likewise explained that when they felt Stern's stomach, which was swelling, they got nervous and called Life Flight as a precaution; he said that stomach swelling can mean internal bleeding, which he testified has a reasonable potential to cause death. Smith had never called Life Flight or heard of anyone doing so since he started working at the mine in 2009 – years before Stern's 2013 injury – and McDonald had never called Life Flight, although he knew of times it had been called. Despite all that, McDonald testified that he did not believe there was a reasonable potential that Stern could die.

---

[5] Smith and McDonald were aware, however, that there are different degrees of internal bleeding and that hardening and swelling of the abdomen can be caused by things other than internal bleeding.

An attendant in the bunker called the mine safety supervisor, Michael Tennant, at home at about 3:30 or 3:45 a.m. The attendant told Tennant that there was an injured worker who had been "pinched between two [pieces of equipment] and EMTs were on their way." (App. at 279.) Tennant decided to go to the mine, even though he did not do so for every accident. He went this time "[b]ecause an employee was pinched between two large pieces of equipment." (App. at 289.) On his way, the attendant called again. The attendant gave more information about the medical personnel and Stern's extraction from the mine, and he said that Life Flight had been called[6] and that Stern "had a broken leg, [a] dislocated indicated hip or some lower-type pelvis-type incident," and "tightening of the stomach[,]" but "was conscious and alert, [and] had been talking." (App. at 280, 330.)

After Tennant arrived, at around 4:30 or 4:45 a.m., he spoke to Smith and others. He called MSHA at approximately 5:09 a.m. Tennant testified, however, that he did not think there was a reasonable potential for death. Rather, he reported the incident "because [inspectors] were going to be rolling in at any point in time, and [he] didn't want them to come in and not know anything about the event[,]" given that "Life Flight was called" and there had been "a serious accident[.]" (App.

---

[6] There is some ambiguity as to whether Tennant learned about the call to Life Flight during the first or second conversation with the bunker attendant.

8

at 318.) He also said that Life Flight is often called even if injuries are not severe enough to notify MSHA.[7]

Stern was ultimately taken to a hospital by ground because it was too foggy for a Life Flight airlift. He did have internal bleeding, but doctors predicted it would stop within an hour and a half, and it did. Surgery was performed because Stern had a broken pelvis.

MSHA inspector Thomas Bochna investigated the incident. He ultimately decided to issue Consol a citation under 30 C.F.R. § 50.10(b) for failing to alert MSHA about the accident within the first 15 minutes after it occurred. He testified that he issued the citation based on the following reasoning:

> [A]fter interviews, investigating the accident, the conditions that the people onsite were observing, I thought in the first 15 minutes there was enough evidence with the things they were reporting that the person was complaining about, what he was feeling, what they were seeing, that it was reasonably – you know, an injury was – reasonable potential to cause death[.]

(App. At 157.) He proposed a fine of $5,000, which was then the minimum under the statute and MSH regulations.

---

[7] In testimony, however, both Tennant and McDonald acknowledged that "red zone" incidents – where a miner enters a pinch point between pieces of equipment – are quite serious.

9

## C.    Procedural History

The citation was litigated before an administrative law judge ("ALJ") who upheld MSHA's citation and the proposed penalty.  Consol promptly appealed to the Commission itself.

The Commission affirmed.   It first determined the appropriate legal standard.  It observed that, "when assessing the merits of a violation under section 50.10(b), the Commission employs a reasonable person standard, resolving reasonable doubt in favor of notification[,]" and it concluded that "[t]he outcome determinative inquiry in this case is whether responsible Consol employees had information that would lead a reasonable person to conclude there was a reasonable potential for death based upon the nature of the injury and the totality of the circumstances." (App. At 8, 10). It further said that, under the "totality of the circumstances" test, "the scope of the relevant evidence available to assist for purposes of section 50.10(b) generally will consist of the evidence available at the scene of the accident, at the time of the accident, and immediately following the accident[,]" and, "[w]hile the record will often contain subsequent relevant information from medical professionals, this information" is less probative because it "will likely not materialize until the time to make a decision to notify MSHA has already passed." (App. At 8.)   The Commission made clear that "[t]he notification requirement does not, and cannot, rest upon a post-medical treatment analysis of the likelihood of death from the injuries." (App. At 9.)

Turning to a review of the facts, the Commission agreed with the ALJ that Consol was aware of information that would

10

lead a reasonable person to conclude that Stern's injuries involved a reasonable potential for death. It said:

> In light of the knowledge and training possessed by Tennant, McDonald, and Smith, we conclude that someone with sufficient authority at Consol was aware of Stern's injury-causing event. These employees surely realized from their training that, when a miner is pinched between major pieces of equipment and then suffers from a distended and hardened abdomen, there is a high potential if not a likelihood of internal bleeding. In turn, nearly every knowledgeable witness testified to the obvious – namely, internal bleeding is a potential cause of death. Under these circumstances, the evidence overwhelmingly demonstrates that a reasonable person possessing the available information would have concluded there was a reasonable potential for death.

(App. at 11; *see also* App. at 10 ("Perhaps most importantly and certainly outcome determinative here, … [Smith and McDonald] became aware of possible internal bleeding, knew such bleeding could cause death, and asked for a Life Flight due to concern over the nature and severity of Stern's injuries, including the circumstances which caused them.").) The Commission concluded that substantial evidence supported the ALJ's "finding that Consol had a duty to contact MSHA immediately after the accident." (App. at 3.)

Next, the Commission considered the appropriate penalty. It rejected Consol's argument that the ALJ "erred in

failing to consider a penalty lower than the statutory minimum of $5,000 because the Commission assesses penalties de novo and is not bound by" the penalty provisions in 30 U.S.C. § 820(a)(2). (App. at 13.) The Commission explained that it "ha[d] determined that an assessment of penalty for a non-flagrant violation of section 50.10(b) is governed by" the limitations in § 820(a)(2). (App. at 13.) And, it reasoned that § 820(a)(4) requires courts to "apply at least the minimum penalties required under" § 820(a), so "[a] statutory scheme [of the sort Consol suggested] that permits the Commission to assess any penalty, however minimal, but requires a reviewing court to impose a penalty of at least $5,000, makes no sense." (App. at 14 (citation omitted).)

Consol timely petitioned for review.

## II. DISCUSSION[8]

Consol raises three primary challenges to the Commission's decision. First, it says the legal standard applied by the Commission is inappropriate. Second, it asserts that the citation is not supported by substantial evidence. And third, it contends that the Commission was not bound by the mandatory minimum penalty of $5,000. Each of those positions is unpersuasive.

---

[8] The Commission had jurisdiction pursuant to 30 U.S.C. §§ 815(d), 823(d). We have jurisdiction under 30 U.S.C. § 816(a)(1). We review legal conclusions de novo and findings of fact for substantial evidence. *Cumberland Coal Res., LP v. Fed. Mine Safety & Health Review Comm'n*, 515 F.3d 247, 252 (3d Cir. 2008).

12

## A. The Commission's Legal Standard

Consol attacks various aspects of the legal standard articulated by the Commission. But that standard is correct and, indeed, compelled by the pertinent statute and regulation, 30 U.S.C. § 813(j) and 30 C.F.R. § 50.10(b).

### i. The Commission's Legal Standard Is Required by 30 U.S.C. § 813(j) and 30 C.F.R. § 50.10(b)

The Commission's legal standard, in summary, is as follows. First, reasonable doubts must be resolved in favor of notifying MSHA; second, liability must be assessed based on whether a reasonable person in the circumstances would view the injuries as having a reasonable potential to cause death; third, the totality of the circumstances must be considered; and fourth, the focus must be on the information available around the time of the injury, so post-hoc medical evidence is less probative.

We have never had occasion to interpret 30 U.S.C. § 813(j) or 30 C.F.R. § 50.10(b), so we start from first principles of statutory and regulatory construction.[9] *Cf. Pa.*

---

[9] Consol does not argue that the regulation conflicts with the statute. Accordingly, we need not consider whether the regulation is an appropriate construction of the statute and we treat both provisions in tandem. We note, however, that there seems to be a gap between the statute and the regulation. Section 813(j) says that an operator must notify MSHA "within 15 minutes of the time at which the operator *realizes* that … an injury … of an individual at the mine which has a reasonable potential to cause death, has occurred[,]" 30 U.S.C. § 813(j)

*Fed'n of Sportsmen's Clubs, Inc. v. Kempthorne*, 497 F.3d 337, 351 (3d Cir. 2007) ("The basic tenets of statutory construction apply to construction of regulations[.]").  Our Pole Star is the principle that, if a statute or rule is unambiguous, we must give effect to its plain meaning.  *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (stating the principle in the context of regulatory interpretation).  We are further guided by the Supreme Court's recent admonition that "hard interpretive conundrums, even relating to complex rules, can often be solved" without "wav[ing] the ambiguity flag[.]"  *Id.*  Indeed, we may not consider a statute or rule to be "genuinely ambiguous" unless it remains unclear after we have "exhaust[ed] all the 'traditional tools' of construction."  *Id.* (quoting *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984)).  Consequently, our analysis proceeds by "'carefully consider[ing]' the text, structure, history, and purpose" of the statute and regulation.  *Id.* (citation omitted).

We start with the language of the notification requirement itself.  *See Food Mktg. Inst. V. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019) ("In statutory

---

(emphasis added), whereas the regulation contains a similar directive but uses the term "knows or should know" instead of "realizes," 30 C.F.R. § 50.10.  But, even if we were to consider that gap, it would not affect our analysis here.  The Commission's decision was premised on its conclusion that Consol "*knew* the requisite information" and that "a reasonable person evaluating the *known* facts would have found a reasonable potential for death."  (App. at 11 n.10 (emphasis added).)  Those factual premises are sound, and we take the same approach.

interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself."). As referenced earlier, § 813(j) provides, in relevant part:

> In the event of any accident occurring in any coal or other mine, the operator shall notify [MSHA][10] thereof and shall take appropriate measures to prevent the destruction of any evidence which would assist in investigating the cause or causes thereof. For purposes of the preceding sentence, the notification required shall be provided by the operator within 15 minutes of the time at which the operator realizes that the death of an individual at the mine, or an injury or entrapment of an individual at the mine which has a reasonable potential to cause death, has occurred.

30 U.S.C. § 813(j). Similarly, the regulation says, in part:

> The operator shall immediately contact MSHA at once without delay and within 15 minutes at the toll-free number, 1–800–746–1553, once the operator knows or should know that an accident has occurred involving: … (b) An injury of an individual at the mine which has a reasonable potential to cause death[.]

---

[10] Again, MSHA is the delegate of the Secretary of Labor.

30 C.F.R. § 50.10. On its face, that language does not specify the standard by which one is to determine whether an injury from a mine accident is one "which has a reasonable potential to cause death." Thus, we look to other sources of guidance.

The first source we consider is the stated purpose of the Mine Act. The "Congressional findings and declaration of purpose[,]" set forth in 30 U.S.C. § 801, specify that the goal of the Mine Act is to protect miners. Section 801 says, for example, that "the first priority and concern of all in the coal or other mining industry must be the health and safety of its most precious resource – the miner"; that "deaths and serious injuries from unsafe and unhealthful conditions and practices in the coal or other mines cause grief and suffering to the miners and to their families"; and that "there is an urgent need to provide more effective means and measures for improving the working conditions and practices in the Nation's coal or other mines in order to prevent death and serious physical harm[.]" 30 U.S.C. § 801(a)-(c); *see also Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 202 (1994) ("Congress adopted the Mine Act 'to protect the health and safety of the Nation's coal or other miners.'" (quoting 30 U.S.C. § 801(g)). Moreover, § 801 makes clear that miner protection is central to the mining industry's interests, so the Mine Act does not seek to balance miners' safety against any inconvenience associated with compliance that mine operators might face. *See* 30 U.S.C. § 801(d) ("[T]he existence of unsafe and unhealthful conditions and practices in the Nation's coal or other mines is a serious impediment to the future growth of the coal or other mining industry and cannot be tolerated[.]"); *see also id.* § 801(f) ("[T]he disruption of production and the loss of income to operators and miners as a result of coal or other mine accidents … unduly impedes and burdens commerce[.]").

The second source of guidance we look to is the objectives of the notification requirement itself. That requirement is plainly designed to encourage rapid notification so that MSHA can respond effectively in an emergency and preserve evidence to facilitate later investigation. Section 813(j) specifies that "any accident occurring in any coal or other mine" is to be reported to MSHA. *Id.* § 813(j). So it is not just potentially deadly accidents that are reportable.[11] Furthermore, § 813(j) says that mine operators must "take appropriate measures to prevent the destruction of any evidence which would assist in investigating the cause or causes" of an accident and, "where rescue and recovery work is necessary, [MSHA] shall take whatever action [it] deems appropriate to protect the life of any person, and [it] may, if [it] deems it appropriate, supervise and direct the rescue and recovery activities[.]" *Id.* Thus, concern for the preservation "of any evidence which would assist in investigating the cause or causes" of accidents, and, more importantly, the need for government action "to protect the life of any person" and manage "rescue and recovery activities[,]" *id.*, justify reporting of non-lethal accidents too. The 15-minute notification window is in force for potentially deadly accidents, and reflects the naturally heightened level of concern. When death is a reasonable possibility, "[i]mmediate notification activates MSHA emergency response efforts, which can be critical in saving lives, stabilizing the situation, and preserving the

---

[11] Under the Mine Act, "accident" is defined to include "a mine explosion, mine ignition, mine fire, or mine inundation, or injury to, or death of, any person[.]" 30 U.S.C. § 802(k).

17

accident scene[,]" and "[p]rompt notification enables MSHA to secure an accident site, preserving vital evidence that can otherwise be easily lost."[12] Emergency Mine Evacuation, 71 Fed. Reg. at 71,431, 71,435.

The final source of guidance is the history of the notification requirement. Relevant here, the 15-minute rule was added to the statutory framework by the MINER Act, which was enacted largely in response to three lethal mining accidents. S. Rep. No. 109-365, at 1-2, 9; *see also Cumberland Coal*, 717 F.3d at 1022 ("The violations at issue in this case arose under amendments to the [Mine] Act enacted in response to three multiple-fatality mine disasters, in which miners who were unable to evacuate mines died."). The MINER Act Senate Report explained that "[t]hese tragedies serve as a somber reminder that even that which has been done well can always be done better." S. Rep. No. 109-365, at 2. The MINER Act codified an MSHA emergency regulation that first imposed the 15-minute notification rule. *See* Emergency Mine Evacuation, 71 Fed. Reg. 12,252 (Mar. 9, 2006).

That earlier MSHA emergency regulation was promulgated in response to two of the same incidents that

---

[12] Under the regulation, the 15-minute notification requirement attaches to all "accident[s,]" 30 C.F.R. § 50.10, and the regulatory definition of "[a]ccident" includes 12 specific types of events, including "[a]n injury to an individual at a mine which has a reasonable potential to cause death[,]" *id.* § 50.2(h) (emphasis added). The statute and regulation thus agree that potentially deadly accidents require notification within 15 minutes. *Cf. id.* § 50.10(a)-(c) (requiring notification within 15 minutes for deadly or potentially deadly accidents).

motivated the MINER Act. *Id.* at 12,252, 12,253-54; *see also Cumberland Coal*, 717 F.3d at 1022 ("Also in the wake of the disasters, MSHA issued an Emergency Temporary Standard on emergency mine evacuations in March 2006."). The emergency rulemaking explained that, "[i]n response to the recent accidents …, MSHA has determined that new accident notification, safety and training standards are necessary to further protect miners when a mine accident takes place." Emergency Mine Evacuation, 71 Fed. Reg. at 12,253. The very first of the "new standards" described was the 15-minute rule, and MSHA emphasized that the rule would serve to better protect miners by facilitating the objectives of the notification requirement, as set out above. *See id.* ("Such immediate notification will enable help to arrive sooner at the mine, and protect miners from the grave dangers of physical injury and death."); *id.* at 12,257 ("Notification alerts the Agency so that accident investigations and assistance to trapped or injured miners can be initiated."). In sum, the history of the notification requirement shows that a 15-minute provision was adopted in response to deadly mine accidents and was meant to increase the speed of notification to allow MSHA to more effectively protect miners.

Considering those several guideposts together, it is plain that the notification requirement was designed to serve the Mine Act's unyielding purpose of protecting miners by encouraging rapid notification, thereby allowing MSHA to effectively initiate an emergency response and to ensure the preservation of evidence for use in investigations. The notification requirement should be interpreted to effectuate that purpose. In light of that, the Commission's legal standard is entirely sound, as a consideration of each of the four components of that legal standard demonstrates.

19

### 1. Reasonable Doubts Must Be Resolved in Favor of Notification

First, it makes sense that all reasonable doubts must be resolved in favor of notifying MSHA. If the rule were otherwise, mine operators would be encouraged not to call MSHA until an accident was sure to be life threatening,[13] despite the standard being an accident having "a reasonable potential to cause death." The severity and scope of an emergency are rarely apparent in the moment, and by the time clarity has been achieved, an MSHA response may be too little, too late. Furthermore, no risk to miners would result from an erroneous MSHA notification, whereas substantial risk could result from a failure to notify, with MSHA being prevented from initiating an emergency response and beginning a successful investigation. Given that the notification

---

[13] The Commission said that it "has not found it necessary to" define "reasonable potential to cause death." (App. at 7 (citing *Secretary of Labor v. Signal Peak Energy, LLC*, 37 FMSHRC 470, 474 (2015)).) In *Signal Peak*, the Commission observed that it was enough to say the accident was "life-threatening[,]" because, in that case, the miner's "injuries clearly [fell] within the realm of a reasonable potential to cause death[.]" 37 FMSHRC at 474 (citation and internal quotation marks omitted). Therefore, the Commission both here and in *Signal Peak* concluded that the injuries at issue had a reasonable potential to cause death under a "life threatening" standard. We follow the Commission's lead in that regard and use "life threatening" as a working interpretation of "reasonable potential to cause death."

requirement and the statutory and regulatory scheme at issue are designed to provide robust protections for miners – and not to balance those protections against compliance difficulties – the only rule that effectuates the purpose of the statute and regulation is one that requires notification in cases where there is reasonable doubt whether the accident will prove to have "a reasonable potential to cause death."

Consol argues that requiring reasonable doubts to be resolved in favor of notification appears nowhere in the text of the statue or regulation and that adopting such a rule shifts the burden of proof to the operator. But that argument misses the mark, because a logical reading of the text does support the rule, as we have just explained, and, in any event, text is the starting point in understanding a statute or regulation, not necessarily the ending point. Moreover, the conclusion that reasonably doubtful cases require notification has nothing to do with who must prove whether a case falls into the "reasonably doubtful" category.

> **2. The Notification Requirement Must Be Interpreted from the Perspective of a Reasonable Person in the Circumstances**

Second, the notification requirement must be analyzed on an objective basis, asking whether a reasonable person in the circumstances would view a miner's injury as having a reasonable potential to cause death. Only an objective test ensures that mine operators cannot weaken miner protection by asserting their subjective views as a defense against calling MSHA. An objective standard – which focuses on the reasonably perceived severity of an accident in the

21

moment – likewise reinforces the incentive for mine operators to notify MSHA quickly, when the agency can take effective action.

To its credit, Consol does not claim that a subjective standard would suffice. Rather, the alternative rule it argues for would require MSHA to prove that the injured miner actually faced a reasonable potential for death as a matter of medical fact, even if the actual severity of his injuries was unknowable at the time of the incident. That rule, however, like a subjective standard, would undermine what the notification requirement seeks to accomplish. In marginal cases, it would encourage mine operators to forego calling MSHA after an accident in the hopes that the true but presently unknown medical facts would turn out to be better than those perceived in the moment. Under Consol's proposal, an injury would not become reportable until a mine operator has gained sufficient expert advice to say with medical certainty that the injury had a reasonable potential to cause death. That, of course, would mean almost certain delay, since physicians are not on standby in mines.[14] Consol's rule would thus frustrate rather than facilitate reporting. *See Sec'y of Labor v. Cougar*

---

[14] Consol asserts that delay would not be a problem, contending that "[t]he immediacy burden on Consol has nothing to do with the elemental burden on the Secretary." (Opening Br. at 27.) But we fail to see how that could be so. If MSHA can only prove whether an injury having a reasonable potential to cause death occurred by resorting to medical evidence, it follows that a mine operator could not have sufficient awareness of the occurrence of such an injury until the medical evidence is available, and it is highly unlikely to be available on site.

*Coal Co.*, 25 FMSHRC 513, 521 (2003) ("If we were to accept the [ALJ's] construction [requiring that MSHA furnish a medical opinion that a miner's injuries had a reasonable potential to cause death], a medical or clinical opinion of the potential of death would be needed before an accident is even determined to be reportable under section 50.10. Such a construction would serve to frustrate the immediate reporting of near fatal accidents.").

The conclusion that a "reasonable person in the circumstances" standard is the required one – and that a rule focused on the eventually proven medical severity of an injury is not – is further supported by our determination that reasonable doubts must be resolved in favor of notification. When the perceived severity of an injury is high but the true medical severity is not yet known, a mine operator should surely have a reasonable doubt about concluding that no reasonable potential for death exists.

Finally, in *Mainline Rock & Ballast, Inc. v. Secretary of Labor*, 693 F.3d 1181 (10th Cir. 2012), one of the few Court of Appeals opinions on point, the Tenth Circuit upheld a citation under 30 C.F.R. § 50.10(b) by applying a "reasonable person in the circumstances" test, and it did so without ever addressing whether MSHA had proven that the injury involved a reasonable potential for death as a matter of medical fact. *Mainline Rock*, 693 F.3d at 1189. Further, and importantly, the court nowhere described that regulation as ambiguous, but

23

rather treated the standard it applied as the one obviously and logically required.[15]

Although the foregoing analysis adequately demonstrates that the statute and regulation are governed by a "reasonable person in the circumstances" standard, that conclusion is reinforced by the history of the regulation. The post-MINER Act rulemaking expressly said that the notification inquiry "is based on *what a reasonable person would discern under the circumstances*, particularly when '[t]he decision to call MSHA must be made in a matter of minutes after a serious accident.'" Emergency Mine Evacuation, 71 Fed. Reg. at 71,434 (alteration in original) (emphasis added) (citation omitted). And it rejected a focus on the medical facts, stating, "the operator's decision as to what constitutes a 'reasonable potential to cause death' 'cannot be made upon the basis of clinical or hypertechnical opinions as to a miner's chance of survival.'" *Id.* at 71,433-34 (citation omitted).

In short, the standard that best accomplishes the aims of the notification requirement is one that focuses on whether a reasonable mine operator in the circumstances would perceive a reasonable potential for death. Consol challenges that conclusion by asserting that, under a "reasonable person in the circumstances" standard, "the operator would face an ever-moving target and have no way to defend itself[.]" (Opening Br. at 26.) Not so. The target is clear, even if it is not the one Consol would prefer to have in its sights. Giving Consol what

---

[15] Because the operative language of the statute and regulation are the same, we view *Mainline Rock* as supporting our interpretation of both.

it wants – a complete defense based on medical facts unknown at the time – would, as set out above, substantially conflict with the statutory and regulatory framework before us.[16]

### 3. The Totality of the Circumstances Must Be Considered

It is also clear that § 813(j) and its regulatory counterpart, § 50.10(b), must be applied in light of the "totality of the circumstances." Under a "reasonable person in the circumstances" standard, the circumstances to be considered are necessarily all of them, not just some. How else could one be expected to assess whether an injury suggests a reasonable potential for death, other than by using a "totality of the circumstances" test? Injuries, by the very nature of the accidents that cause them and the complexity of the human body, come in too many varieties to easily catalogue. And the factors suggesting that an injury is serious are just as diverse. A "totality" inquiry is thus proper because, as with other matters of judgment, whether an injury is reasonably perceived as life threatening is "not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232, 238 (1983) (concluding that a "totality of the circumstances" test was appropriate in a Fourth Amendment case); *see also*

---

[16] Consol also argues that, "[h]istorically, ALJs actually required the Secretary to present medical proof to sustain a violation[.]" (Opening Br. at 23.) That argument, however, gains no traction because, even if the historical assertion is accurate, the statute and regulation are unambiguous, and ALJ decisions neither bind the Commission nor qualify as agency precedent. 29 C.F.R. § 2700.69(d); *Big Ridge*, 715 F.3d at 640.

*Mainline Rock*, 693 F.3d at 1189 (upholding a citation under 30 C.F.R. § 50.10(b) after holistically analyzing a mining accident and concluding that "the obvious circumstances of the accident would have triggered some minimal degree of inquiry in a reasonable person, thus prompting a call to the MSHA").

Again, the purpose of the notification requirement has to be borne in mind. Myopically focusing on one factor or a subset of factors, rather than the totality of the circumstances, would permit mine operators to avoid calling MSHA, even while possessing information reasonably showing that an injury is life threatening, simply because that information did not fit into an artificially-constructed category. Any test other than one based on a "totality of the circumstances" would thus put miners at unnecessary risk and would undermine the purposes and design of the notification requirement.

The necessity of a "totality" approach is underscored by the above-noted conclusion that all reasonable doubts must be resolved in favor of notification. A holistic approach captures the full range of information that could lead to reasonable doubts about concluding that no reasonable potential for death exists.

The history of the regulation remains instructive. The notification decision was expressly contemplated as being "based on what a reasonable person would discern *under the circumstances*[.]" Emergency Mine Evacuation, 71 Fed. Reg. at 71,434 (emphasis added). And, the drafters of the regulation explained that injuries involving a reasonable potential for death "can result from various indicative events," so they

26

encouraged that all factors, including the injury itself and the nature of the accident, be considered.[17] *Id.*

Consol mainly challenges the "totality of the circumstances" rule on the ground that it permits factors not listed in the statute or regulation to overcome a lack of medical evidence. In that regard, it contends that the focus must be on the injury alone and not the circumstances surrounding it

---

[17] We note that "totality of the circumstances" can be read in two different, albeit related, ways. First, it can refer to what the mine operator must consider in deciding whether to call MSHA. Second, it can refer to the evidence courts and the Commission should consider in evaluating a notification charge. In our view, both readings are appropriate and required. That is so for the first reading for all the reasons set out above. And it is so for the second reading because that reading is simply the adjudicatory corollary of the first.

The second reading is broader than the first, as it allows consideration of evidence that was not actually before the mine operator at the time the operator made the decision whether to notify MSHA. But considering all available evidence is appropriate at the adjudication stage because it can provide important circumstantial evidence of what a reasonable mine operator would have perceived. For example, if there were little direct evidence of what a mine operator actually saw around the time of an accident, but the record demonstrated that numerous mine employees were nearby when the accident occurred and that a post-hoc medical examination revealed that the injured miner had been bleeding profusely since the moment of injury, the post-hoc medical evidence could be viewed as significant circumstantial evidence of what was known at the scene.

27

– such as the nature of the accident – because "injury" is what appears in the text. It further asserts that "[r]ushing to get someone to the hospital fast is not proof that someone may die" and neither "is the nature of the accident (e.g., a car being totaled sounds terrible, but people walk away from such accidents)." (Reply Br. at 16 n.9.) And, more generally, it warns that, "[i]f the Court allows uninterpreted generalized observations to act as a substitute for evidence, then all the Secretary will have to do is call one witness to describe a chaotic injury scene and the ALJ, who also has no medical training, would then be free to speculate that virtually any injury has a reasonable potential to cause death." (Reply Br. at 17.)

Those arguments conveniently neglect that generalized observations *are* evidence, often crucial evidence, and nothing in the statute or regulation requires or even encourages that they be ignored. Consol's suggestion that a "totality" standard is inappropriate because it allows consideration of factors that are not listed in the statute or regulation rests on the blinkered notion that only that which is express and nothing that is plainly implied is the meaning of a text. Ordinary experience and general legal principles prove that wrong. *Cf. Gates*, 462 U.S. at 232, 238 (adopting a "totality of the circumstances" test in the probable cause context even though the Fourth Amendment does not mention "totality of the circumstances" or describe what those circumstances might include).

Furthermore, Consol's argument that a "totality" inquiry can wrongly be used to "overcome" a lack of medical evidence could only be true if the notification requirement focused on whether the injured miner faced a reasonable potential for death as a matter of medical fact. But that is not

28

the case, for reasons already discussed. Later-developed medical evidence is not the focus. And, we cannot accept the contention that the notification requirement forbids consideration of the circumstances surrounding an injury, such as the nature of the accident that caused it.

Relatedly, Consol's assertion that some factors considered under a "totality" inquiry might not prove a reasonable potential for death is beside the point. Yes, an individual fact taken in isolation may not prove something, but that does not make the fact irrelevant. The very reason to have a "totality" inquiry is so that all facts can be considered together and analyzed holistically. In that regard, the fear that a mere description of a chaotic scene will lead to liability is unfounded. Under a test that examines all available evidence, a description of a chaotic scene, without more, is unlikely to establish that an injury involving a reasonable potential for death had occurred. It is the "more," not the chaotic scene, that Consol needs to be chiefly worried about.

Lastly, Consol's position is unconvincing in light of what both the post-MINER Act rulemaking and *Mainline Rock* persuasively instruct. The rulemaking explained that certain injuries involving a reasonable potential for death "can result from various indicative events," demonstrating that the nature of the accident is a relevant consideration. Emergency Mine Evacuation, 71 Fed. Reg. at 71,434. And, in *Mainline Rock*, the court made clear that the nature of the accident is relevant and, indeed, could be dispositive. *See* 693 F.3d at 1189 ("Th[e] knowledge [that a miner had been pulled through a roller] alone would have alerted [a mining official] to the severity of the accident and the potential for death.").

29

**4. The Focus of the Notification Requirement Must Be on the Information Available at the Time of Injury, So Post-Hoc Medical Evidence Is Less Probative**

Finally, because the focus of the notification requirement must be on the information available to the mine operator around the time of the injury, post-hoc medical evidence is less probative of whether MSHA should be notified. If reasonable doubts are to be resolved in favor of notification, evidence that was not available at the time of the injury, such as post-hoc medical evidence, will not resolve reasonable doubts created in the moment by an injury that is apparently life threatening. The focus must be on the facts available at the time of injury, and post-hoc medical evidence can, at best, serve in the attenuated role of raising an inference about what the mine operator perceived, including the injury's apparent severity. If the totality of the circumstances around the time of the accident is considered – as it must be – the importance of post-hoc evidence will necessarily be diluted.[18]

---

[18] Consol counters that, "[u]ntil now, hospital-based information has been routinely relied upon by the Commission in other cases." (Reply Br. at 12.) But neither of the decisions Consol cites actually relied on such evidence. *See Signal Peak*, 37 FMSHRC at 473, 476-77; *Cougar Coal*, 25 FMSHRC at 521. More to the point, however, nothing in the Commission's ruling or in ours today prevents reliance on hospital-based information, when that information is kept in proper perspective.

### ii.     Consol's Additional Challenges to the Commission's Legal Standard Are Unavailing

Consol raises two additional arguments challenging the Commission's legal standard and its application here. Neither convinces us that the Commission erred.

### 1.     Reasonable Person Comparator Evidence

Consol first argues that, if we adopt a "reasonable person in the circumstances" standard, MSHA should have to present comparator evidence to prove what a reasonable person would have done. It says that, in *Secretary of Labor v. Leeco, Inc.*, No. KENT 2012-166, 2016 WL 4158378 (F.M.S.H.R.C. July 18, 2016), the Commission required such proof.

That argument overreads *Leeco*. In that case, the Commission simply said that, when MSHA seeks to prove that a mining company acted negligently, it cannot satisfy its burden by saying the company "should have done more" and, instead, must "show[] what additional steps" the company should have taken to meet its standard of care. *Id.* at *4-5. That observation is inapposite to notification cases, in which there is no need to determine what "additional steps" might have been required. The core question in cases like this is whether a reasonable mine operator would have called MSHA, and that question is answerable through evidence of the facts available around the time of the accident. Indeed, that has been the Commission's approach, *Secretary of Labor v. Signal Peak Energy, LLC*, 37 FMSHRC 470, 475-77 (2015), and the Tenth Circuit followed it as well in *Mainline Rock*, 693 F.3d at 1189.

31

Furthermore, whether someone acted reasonably is typically a question for the finder of fact, at least as long as "reasonableness" is within the factfinder's common knowledge and experience. *See, e.g.*, *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 580 (3d Cir. 2003) ("A reasonable jury could conclude that [Prison Health Service] personnel were negligent absent expert testimony. … While laypersons are unlikely to know how often insulin-dependent diabetics need insulin, common sense – the judgment imparted by human experience – would tell a layperson that medical personnel charged with caring for an insulin-dependent diabetic should determine how often the diabetic needs insulin."); *Wilburn v. Maritrans GP Inc.*, 139 F.3d 350, 360 (3d Cir. 1998) ("The jury could have found [based on its common understanding] that Maritrans was liable for negligence  because the Samson line was not released in a manner that was reasonably prudent under the exigent circumstances confronting the persons aboard the *Enterprise*."); *cf. Vázquez-Filippetti v. Banco Popular de P.R.*, 504 F.3d 43, 50 (1st Cir. 2007) ("[A] typical tort claim involves the generic 'reasonably prudent person' standard of care (or duty) and requires the plaintiff to present no evidence about the defendant's duty[.]").   It is within the province of the Commission's ALJs to determine whether a reasonable mine operator would have perceived a reasonable potential for death. *Cf. Thunder Basin*, 510 U.S. at 214 (explaining that claims arising under the Mine Act "fall squarely within the Commission's expertise").

Nothing in the statute or regulation suggests an intent to create a novel evidentiary rule requiring "reasonable person" comparator evidence.  We presume that rulemaking authorities are aware of existing law when they promulgate statutes or

regulations. *Cf. Mississippi ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 169 (2014) ("[W]e presume that Congress is aware of existing law when it passes legislation." (citation and internal quotation marks omitted)).  If Consol's proposed evidentiary rule had been envisioned, it would surely have been made explicit in the statute and regulation.

## 2.    Fair Notice

Second, Consol argues that it did not have fair notice of either the Commission's "totality of the circumstances" test or its "reasonable person in the circumstances" standard.  Consol raises a number of arguments in that regard, but, based on a single line of reasoning, we conclude that all are without merit.

The Fifth Amendment's Due Process Clause is violated for lack of fair notice if a statute or regulation "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 249 (3d Cir. 2015) (citation omitted).  That "fair notice doctrine extends to civil cases, particularly where a penalty is imposed."  *Id.* at 250.  But, a party necessarily has fair notice of how a statute or regulation will be interpreted if only one interpretation is unambiguously compelled by the provision at issue.[19]  *See Sec'y of Labor v.*

---

[19] That is not to say that a party can never raise a fair notice challenge to unambiguous laws.  For example, a provision may plainly require a certain legal standard that itself does not provide fair notice of how it will be applied.  A fair notice challenge would be appropriate in that circumstance to contest the required standard.

*Beverly Healthcare-Hillview*, 541 F.3d 193, 197-98 (3d Cir. 2008) ("Before we assess … whether Beverly had fair notice of that interpretation, we must determine whether the meaning of regulatory language is 'free from doubt.' … If Beverly is correct [that the language is unambiguous], our inquiry would be at an end." (citation omitted)). Here, we have concluded that the Commission's legal standard is plainly compelled by the statute and regulation. Consol thus had fair notice of it.

To the extent Consol's argument is that the Commission's legal standard fails to provide fair notice of how it will be applied and so Consol lacked fair notice that the specific factual scenario at issue here would constitute a notification violation, again its position is unpersuasive. Where, as here, an economic regulation is in question, fair notice is deemed given unless "the relevant standard is 'so vague as to be no rule or standard at all[,]'" which is an "especially lax" requirement.[20] *Wyndham*, 799 F.3d at 250 (citation omitted). The Commission's legal standard is not so vague as to fall into that category,[21] and, as suggested already

---

[20] Recall that whether 30 C.F.R. § 50.10 is a proper interpretation of 30 U.S.C. § 813(j) is not at issue here.

[21] Courts commonly conclude that MSHA complies with the fair notice requirement when it "take[s] action to correct violations that would be apparent to a reasonably prudent miner." *Consol Buchanan Mining Co. v. Sec'y of Labor*, 841 F.3d 642, 649-50 (4th Cir. 2016). Here, the Commission's legal standard allows mine operators to be penalized only if a reasonable mine operator would have viewed a miner's injuries as involving a reasonable potential for death.

34

and detailed further herein, we think it extraordinarily clear that the injuries in this case reflected a reasonable potential for death.

### B.   Substantial Evidence Supports the Commission's Decision

Consol also argues that substantial evidence does not support the citation against it. That is a surprising argument, to say the least. The factual finding at issue here is the ALJ's determination – agreed to and affirmed by the Commission – that "responsible Consol employees had information that would lead a reasonable person to conclude there was a reasonable potential for death[.]"[22] (App. at 10.) That finding is conclusive if it is supported by substantial

---

[22] That conclusion is essentially a finding of fact. *See* Restatement (Second) of Torts § 328B cmt. g (Am. Law Inst. 1965) (noting that "[n]ormally the determination of the question whether the defendant has conformed to the standard of conduct required of him by the law is for the jury" and that "it is customarily regarded as a question of fact"); *U.S. Gypsum Co. v. Schiavo Bros.*, 668 F.2d 172, 176 n.2 (3d Cir. 1981) (explaining that the issue of "how a reasonable person would have acted in a like situation" is "a determination that is peculiarly one for the factfinder"); *cf. Cumberland Coal*, 515 F.3d at 259 ("The Commission correctly concluded that there was substantial evidence to support the January 16 citation, since 'a reasonably prudent person would have recognized that the bleeder system failed to continuously dilute and move the methane-air mixture from the worked-out area away from the active workings.'" (citation omitted)).

evidence, "mean[ing] such relevant evidence as a reasonable mind might accept as adequate to support [the] conclusion." *Cumberland Coal Res., LP v. Fed. Mine Safety & Health Review Comm'n*, 515 F.3d 247, 252 (3d Cir. 2008) (citation omitted).

Like the Commission, "we conclude that someone with sufficient authority at Consol was aware of Stern's injury-causing event[,]" given "the knowledge and training possessed by Tennant, McDonald, and Smith," and that "the evidence overwhelmingly demonstrates that a reasonable person possessing the available information would have concluded there was a reasonable potential for death."[23] (App. at 11.)

To recapitulate some relevant facts, McDonald learned immediately after the accident that Stern had been crushed between multi-ton pieces of equipment, was in severe pain, could not move his legs, and could feel "the pinch" on one leg. McDonald called for Smith (an EMT), for an ambulance, and (along with Smith) for the mine haulage to be cleared so Stern could be evacuated. McDonald knew the serious consequences of such an accident. Smith viewed Stern's injury as "[p]retty bad" and "traumatic[.]" (App. at 220.) Demonstrating concern that Stern might have a spinal injury, Smith placed him in a neck brace.

On the way out of the mine, Smith and McDonald noticed that Stern's stomach was becoming hard and distended, a sign, they knew, of internal bleeding. Both recognized that

---

[23] Consol does not challenge that the knowledge of Tennant, McDonald, and Smith can be imputed to it for purposes of the notification analysis.

36

internal bleeding can lead to death. And Smith and McDonald were sufficiently concerned about Stern's stomach symptoms to request a Life Flight evacuation. Neither Smith nor McDonald had ever called Life Flight before, and Smith had not heard of anyone doing so since he started working at Consol years before. Additionally, Stern himself evidently thought the accident could be fatal, and he said as much by asking Smith to pass on his love to his wife and family.

Furthermore, Tennant was called about the accident and decided to go to the mine, even though he did not always do so after an accident. He did so in this instance because Stern had been caught between two large pieces of equipment.

In short, McDonald, Smith, Tennant, and Stern all had reactions to the injury indicating an expectation that the injury was life threatening. On this record, there is certainly "such relevant evidence as a reasonable mind might accept as adequate to support" the finding that Consol possessed information that would lead a reasonable mine operator to conclude that a reasonable potential for death existed. *Cumberland Coal*, 515 F.3d at 252 (citation omitted). Consol should have called MSHA within the prescribed 15-minute window.

None of this is to fault McDonald, Smith, or Tennant for how they responded to Stern's injury. They reacted quickly and commendably to provide effective care to Stern in his extremity. We simply conclude that a reasonable mine operator, possessing the information they had, would have

believed the incident had a reasonable potential to turn fatal, and there was thus an obligation to call MSHA.[24]

### C. The Commission Was Bound by the Mandatory Minimum Penalty

Consol's final argument is that the Commission was not bound by the $5,000 statutory minimum penalty under 30 U.S.C. § 820(a)(2) for notification violations. Again, the company is wrong.

Section 820 is the Mine Act's penalties section. Under subsection (a)(2), "[t]he operator of a coal or other mine who fails to provide timely notification to the Secretary as required under section 813(j) … (relating to the 15 minute requirement) shall be assessed a civil penalty by the Secretary of not less than $5,000 and not more than $60,000." 30 U.S.C. § 820(a)(2). And, under subsection (i), "[t]he Commission shall have authority to assess all civil penalties provided in this chapter." *Id.* § 820(i). The penalties set out in § 820(a), including the mandatory minimums, are "penalties provided in this chapter," meaning that the Commission is bound by those minimums.

---

[24] Additionally, and relatedly, our opinion should not be read to discourage mine operators from taking precautions such as calling for an airlift in the event of a mine injury. A mine operator's reaction to an injury is, of course, relevant in assessing that injury's reasonably perceived severity. But, under a "totality of the circumstances" approach, a mine operator's reaction to a particular injury is considered alongside, *inter alia*, how the operator has reacted to other, less severe injuries.

In addition, subsection (a)(4) provides, "If a court … sustains [an order imposing a penalty described in this subsection], the court shall apply at least the minimum penalties required under this subsection." *Id.* § 820(a)(4). We agree with the Commission that, given that language in § 820(a)(4), "[a] statutory scheme that permit[ted] the Commission to assess any penalty, however minimal, but require[d] a reviewing court to impose a penalty of at least $5,000, [would] make[] no sense." (App. at 14.)

In sum, the Commission was bound by the mandatory minimum set forth in 30 U.S.C. § 820(a)(2), and its conclusion in that regard was not erroneous.

## III. CONCLUSION

For the foregoing reasons, we will deny the petition for review.